## Andrew Hogg and Pluto Coal Company v. Forsythe.

(Decided March 23, 1923.)

### Appeal from Webster Circuit Court.

1. Evidence—Court Will Take Judicial Notice of Transportation Conditions in 1919.—The court will take judicial notice of the existing transportation conditions in the spring of 1919, when all the principal transportation systems were in the hands of the government and were being operated primarily for governmental purposes, and during which there was much delay and confusion in the shipment of freight.

2. Contracts—"Forfeitures" not Favored Either at Law or in Equity.—Forfeitures are not favored either at law or in equity, since a forfeiture from its nature implies the taking away from one of some pre-existing right.

3. Contracts—Provisions Strictly Construed Against Party Claiming Forfeiture.—A forfeiture clause in a contract will be strictly construed against the party who has invoked it and claims the right of forfeiture, and the forfeiture will not be declared except under the strict and literal terms of the instrument.

4. Mines and Minerals—Coal Lease Held to Permit Forfeiture Only on Concurrence of Three Conditions.—A provision in a coal mining lease that, if lessee failed to make payments of royalty and the $2,500.00 when due, and to otherwise keep and observe the conditions of the lease, lessor might at his option declare the contract null and void, gave the right of forfeiture only when all three of the conditions stated concurred.

5. Mines and Minerals—Lessor Held to Have Waived Right to Forfeit Coal Mining Lease.—Where operation of a mine under a lease had been delayed for a month after lessee took possession, a statement by lessor to lessee encouraging the latter to pay the expenses incurred up to that date, which otherwise lessor would have had to pay, with a statement it would be all right if lessee would return the following Monday morning and begin the active operation, shows waiver by lessor of any right he might have had at that time to forfeit the lease.

6. Specific Performance—Right Rests in Court's Discretion.—The right of specific performance is not an absolute right, and whether it will or will not be enforced in a given case rests in the sound judicial discretion of the chancellor.

7. Specific Performance—Lessee Held Entitled to Specific Performance of Coal Lease With Option to Purchase.—Where a coal mining lease, in addition to giving the lessee the right to operate the lease on making certain payments for a term of one year, also gave him the option to purchase the property and to have credited on the purchase price all payments, theretofore made by him, which was a provision favorable to the lessees after substantial

payments had been made the lessee was entitled to have specific performance of the contract by the lessor decreed.

8. Mines and Minerals—Receipt and Retention for a Month of Deed Conveying Land as Part Consideration for Lease Held to Create Presumption of Acceptance.—Where a coal mining lease required the lessee to convey other land to the lessor as part of the consideration, and the lessee executed the deed and delivered it to the lessor, the latter's retention of the deed for a month raises a presumption of acceptance, and a finding by the trial court that he had never accepted the deed was manifestly erroneous.

9. Mines and Minerals—Statute Authorizing Forfeiture of Term for Assignment Does Not Apply to Coal Lease with Option to Buy.—Ky. Stats., section 2292, authorizing forfeiture of a term less than two years for assignment by the lessee without the landlord's consent, does not apply to a coal mining lease for a term of only one year, coupled with a right to the lessee to purchase the property during the term.

10. Appeal and Error—Lessee Wrongfully Dispossessed Held Entitled Either to Unexpired Portion of Term or to Recovery of Damages.—Where lessee was wrongfully dispossessed and his prayer for an injunction against the lessor erroneously denied, he is entitled after reversal of the judgment denying the injunction, either to the possession of the premises for a period equal to the unexpired portion of the term at the time of the wronful dispossession, or, at his option, to a recovery of the damages sustained by him because of such wrongful dispossession.

11. Appeal and Error—Lessee Wrongfully Dispossessed Held Entitled to Amounts Expended by Him Though Cause Otherwise Reversed.—Where a lessee under a coal mining lease was wrongfully dispossessed by his lessor, the portion of a judgment refusing an injunction against the lessor which required the lessor to repay to the lessee the actual money which he had expended upon the leased premises and the value of the material which had been left thereon need not be reversed on reversal of the decree denying the injunction.

HUNTER WOOD and TRIMBLE & BELL for appellants.

COX & GRAYOT and BENNETT & WITHERS for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing on original and affirming on cross appeal.

On and prior to the 6th of March, 1919, appellee Forsythe was the owner of a coal mining property consisting of about one hundred and thirty acres at or near Providence in Webster county. The property had been previously operated as a coal mine, but because of an explosion therein in December, 1918, there was little done in the mine between that and March, except certain

repairs and restoration work made necessary by the explosion.

By a writing dated the 6th day of March and executed by Forsythe on the 11th day of March and by appellant Hogg on the 12th day of March, Forsythe and Hogg entered into a written contract and lease whereby Forsythe leased to Hogg the coal mining property for the term of one year,

"Second party to take possession of said mine and equipment and begin the operation thereof on the 15th day of March, 1919, and to continue in the operation of and charge of said mine for a period of one year from this date."

As a consideration Hogg agreed to convey to Forsythe by deed of general warranty forty acres of land, including the mineral rights and privileges, in Hopkins county, Kentucky, near Mannington, which Forsythe was to accept at the price of sixty dollars per acre if the full title thereto was conveyed to him, but if only the coal and mineral rights were conveyed the same was to be valued at fifty dollars per acre; a further consideration was that Hogg was to pay to Forsythe on or before six months from the date of the contract twenty-five hundred dollars, and further to pay to Forsythe twenty-five cents per ton on all coal mined, to be paid on the first day of each month for the coal mined the previous month. Hogg also agreed to install proper shaker screens at the tipple and install in the mine two forty-two inch gauge mining machines and fifteen mine cars without cost to Forsythe; he also agreed to keep employed as foreman in the mine men of practical mining experience, and there were many other minor provisions not involved in this controversy.

After these agreements and undertakings by the parties, the following forfeiture clause is inserted, to-wit:

"It is also agreed and understood that should second party (Hogg) fail to make his payments of royalty, and the twenty-five hundred dollars when due, and to otherwise keep and observe the conditions of this lease, then first party (Forsythe), may at his option, declare said contract null and void."

Under additional provisions of the contract Hogg was further given the right at any time during the life

thereof to buy the property at the price sixty thousand dollars, and in the event he exercised that right there was to be credited on the purchase price all the royalties theretofore paid, the twenty-five hundred dollars if theretofore paid, the value of the forty acres of coal land according to the agreed value thereof, and the terms of the payment of the balance of the purchase price were inserted.

Accordingly on the 15th day of March possession of the coal mining property and all its equipment was turned over to Hogg, and on the same day he employed a foreman recommended by Forsythe and placed him in charge of the property with authority to employ others. At or about the same time he caused to be delivered to Forsythe a deed to the Hopkins county forty acres of coal rights for which Hogg had theretofore paid.

Shortly after Hogg got possession of the mine he contracted for the shaker screens provided for and the two mining machines and about double the number of mining cars he had agreed to furnish, and in addition contracted for a pump and certain pipe to be used in connection therewith in the various sections of the mine to rid the same of water. Because, however, of the congested condition of the railroads at that time and the difficulty in getting certain kinds of material, there was some delay about these things, although there is nothing from which it may be said it was the fault of Hogg. During the period between the 15th of March and the 8th of April Hogg was at the mine several times—his home being in another county—and his foreman Lloyd and other persons were engaged in the mine in getting the same in shape for active operations. It appeared to Hogg as a practical miner that the first necessary thing to do was to rid the mine of water, particularly the low places in it, although there is some evidence that even when he took possession of the property some parts of it were in shape to produce coal. Between the 15th of March and the 8th of April several telephone talks occurred between Hogg and Forsythe wherein the latter urged Hogg to begin the production of coal, but when Hogg explained to him in these conversations the difficulty of getting the new material which he had ordered and the necessary delays at that time in shipments, he (Forsythe) appeared to be satisfied and told him to do the best he could.

A day or two, however, before the 8th of April there appeared at Providence two men, Hall and Force, who were seeking to purchase or invest in coal mining properties. They had some talk with Forsythe, and about the 7th of April some. friend of Hogg telephoned him at his home that Forsythe was about to make, or starting to make a deal with Hall and Force, who appear to have been known as the "Oklahoma parties." Accordingly on the 8th of April Hogg came to Providence to investigate the rumor and had a talk with Forsythe about it. The latter said to him in substance that he had been talking to the Oklahoma parties, but that he had made no deal with them and did not intend to make any, that he, Hogg, had a good contract with him and he had a right to operate the property. On the same day Forsythe suggested to Hogg that there had accrued a payroll at the mine since he had been in possession of it and that he had better pay it, and Hogg did on that. day in response to this suggestion pay the payroll for about three weeks at the mine, amounting to one hundred fifty-four dollars and a half. On that same day Hogg told Forsythe that he had heard certain of the material which he had ordered had been shipped and would probably be there by the following Monday, and that he then expected to begin active operations, and it is in evidence by Hogg and two or three others that then on the 8th day of April Forsythe said to him that it would be all right and that if the material came before that time he (Forsythe) would take care of it. But, notwithstanding this agreement made on the 8th of April, three days thereafter on the 11th of April Forsythe entered into a contract with the Oklahoma parties whereby he sold to them the same coal mining property he had previously contracted to Hogg upon condition that he could be released from his obligations to Hogg, and agreed that he would exercise the right which he thought he had to declare the Hogg lease void and forfeit the same, and the next day, April 12th, caused to be mailed to Hogg at his home a letter declaring his forfeiture of the contract between them, and in addition sent a notice to be executed on Hogg by the sheriff of his county. That, however, was on the 12th day of April, which was Saturday, and while the notice and letter may have reached the home town of Hogg late Saturday afternoon or night, the following day being Sunday the letter was not delivered to him and the notice did not come to the hands of the sheriff until

Monday morning the 14th. But in the meantime, in compliance with his agreement with Forsythe, Hogg had left his home on Sunday afternoon, the 13th of April, to go to Providence and there receive and install the material which he then thought would be there and comply with his agreement to start active operations at the mine on the next day. He and several other practical mining men as his employes went that afternoon to Providence and early the next morning the fires were started at the mine and the material which was at the station was hauled to the mining plant. Appellee Forsythe was present when a large part of that material was hauled on to the premiess and unloaded there, but entered no objection and made no protest until after the whole three loads of material were placed upon the property, and then, for the first time, declined to permit Hogg's employes to place the pipes and some of the material in the mine, because he said Hogg had forfeited his contract, and thereafter locked up the place and kept the keys and warned all parties to remain outside.

It was contemplated and understood by all parties, including Forsythe, at the time Hogg entered into this contract, that he was to assign it to a corporation thereafter to be organized, and such corporation was organized and known as the Pluto Coal Company, and on the 11th day of April, 1919, Hogg assigned his said contract and all the benefits thereunder to the Pluto Coal Company.

Thereafter, on the 30th day of April, Hogg and the Pluto Coal Company instituted this equitable action against Forsythe, seeking to enjoin him from taking or holding possession of the mining property or doing or continuing to do any of the things he had asserted the right to do, and asking for damages against him because of his said conduct in taking possession of the property, and asked the court to confirm their right to the possession, use and enjoyment of the property and to specifically enforce their contract under its terms.

The issues were made up and upon a final submission the court entered a judgment dismissing the plaintiff's petition insofar as it sought a specific performance of the contract or any damages resulting to them from the action of Forsythe in declaring the same forfeited; and in addition held that Forsythe had never accepted the deed to the forty acres of land which was a part of the consideration for the contract of March 6th, but adjudged

that the plaintiffs should recover from Forsythe the sum of nine hundred and fifty-four dollars and a half, being the value of the material placed on the ground by Hogg and his associates and the amount paid out by Hogg for expenses. From that judgment Hogg and the Pluto Coal Company have appealed, and Forsythe is prosecuting a cross appeal from that part of the judgment which is against him.

An examination of the evidence is convincing, not only that Hogg and his associates intended in good faith to operate the mine under the terms of the lease, but that they in fact intended to purchase the same under the right therein granted. Hogg not only ordered and contracted for more material than he was bound to do under his contract, not only did he on the day he took possession employ a capable foreman who had been suggested by Forsythe, not only did he about the same time the contract was made cause to be conveyed to Forsythe the forty acres of mining lands which had cost him (Hogg) over two thousand dollars, not only did he on the 8th of April and about three weeks after he had taken possession pay the payroll at the suggestion of Forsythe, but pending this action and within the six months specified in the contract he tendered to Forsythe the twenty-five hundred dollars payment therein provided for. He had also contracted for the purchase of the two mining machines mentioned in the contract at a cost of something like thirty-eight hundred dollars, and it is clear from the evidence that as late as the 8th day of April Forsythe had recognized the fact that owing to then existing conditions Hogg had been unable to get the material he had ordered shipped sooner, and plainly by his conduct on that day acquiesced in the delay up to that time and agreed that the active operations might begin on the Monday thereafter, the 14th day of April.

The court will take judicial knowledge of the existing transportation conditions in the spring of 1919. At that time not only were all the principal transportation systems in this country in the hands of the government, but they were being operated primarily for governmental purposes first, and common experience brings to our notice the fact that during that period there was much delay and confusion in the shipment of freight.

Forfeitures are not favored either at law or in equity. A forfeiture from its nature implies the taking away

from one of some pre-existing right, and this the courts will never do unless the equities of the situation are such there is no way to avoid it.

Not only so, courts are always slow and reluctant to declare or enforce a forfeiture, and in the interpretation of a forfeiture clause in a contract will strictly construe it against the party who has invoked it and claims the right of forfeiture. 6 R. C. L., p. 906.

Keeping these general rules in mind, let us analyze the language in the forfeiture clause involved. It provides it is

"Agreed and understood that should second party fail to make his payments of royalty *and* the twenty-five hundred dollars when due, *and* to otherwise keep and observe the conditions of this lease, then first party may, at his option, declare said contract null and void."

The only grammatical meaning of this language is that three things must happen before the right of forfeiture accrues: (a) A failure to make the payment of royalty; (b) a failure to pay the twenty-five hundred dollars when due; and (c) to otherwise keep and observe the conditions of this lease. All three of these things under the plain meaning of the language must concur before the right of forfeiture accrues, and there is no allegation or proof either that there was a failure to pay accrued royalties, or that the twenty-five hundred dollars was not tendered before it was due. The language must be interpreted against the one claiming the forfeiture, and the forfeiture will not be declared except under the strict and literal terms of the instrument.

But waiving that interpretation entirely, and waiving for the purposes of this opinion the question whether Hogg had in fact been guilty of such neglect and failure to comply with his contract as in the first place would have justified Forsythe in declaring a forfeiture, we unmistakably find from the evidence that as late as the 8th of April Forsythe not only encouraged Hogg to pay the expenses of the operation for the last three weeks, but actually said to him that it would be all right if he would return the following Monday morning (the 14th) and begin the active operation. But we find between the 8th and the 14th the Oklahoma parties are dickering for the property, and we find that they, or someone, had induced Forsythe to believe that under the terms of his contract he had a right to declare a forfeiture of the contract with Hogg, and we find him on the 11th enter-

ing into a conditional contract with the Oklahoma parties whereby they are to purchase the property in the event he declares such a forfeiture and is able to enforce it.

The evidence is entirely satisfactory that the language and conduct of Forsythe on the 8th of April operated as a waiver of his right to declare a forfeiture under the terms of the contract until after the 14th day of April. After, on that date (8th of April), procuring Hogg to pay out one hundred and fifty-four dollars in expenses, which he admits he would otherwise have had to pay, and agreeing with Hogg that he might return on the following Monday and begin the production of coal, he was clearly estopped to enforce the forfeiture before that time.

We have preferred to place the decision of this case on the merits rather than go into a technical determination of the question whether there had been in fact within the meaning of the law, and within the meaning of the contract involved, an "operation" by Hogg of the mine up to the 14th day of April. We have found no difficulty in reaching the conclusion that under all the equities involved, even if technically Forsythe had ever had the right of forfeiture, he had expressly waived it by his conduct and language, and had no intention to enforce any such alleged right until tempted by some attractive proposition made to him by the "Oklahoma parties."

The right of specific performance of course is not an absolute right, and whether the same will or not be enforced in a given case rests in the sound judicial discretion of a chancellor, to be exercised by him after full consideration of all the facts and circumstances and equities involved.

The contract in this case was a most valuable one for Hogg and the coal company to which he assigned it. It provided not only for the operation of the property during the term of one year, but it provided that all the consideration of every kind paid for such operation would, in the event they exercised their right of purchase under the contract, be applied as payments thereon. The two thousand dollars represented by the forty acre tract of coal land, the twenty-five hundred dollars to be paid in six months, and the full amount of all royalties paid were to be considered and treated as payments on the purchase price if the lessee exercised his right of purchase. The other terms of purchase were favorable,

and as above stated it is clear Hogg and his associates fully intended to exercise the right of purchase, and were making every arrangement with that end in view and would have made at the end of the first year a very substantial payment on the property which they sought to buy if that right was exercised.

Mr. Forsythe had a definite idea about the value of his property; he had operated the property as a coal mining proposition and he had agreed to such terms of payment in the contract in the event lessee exercised the right of purchase as would have been very favorable to him. The lessee was to pay, in addition to the credits above referred to, five thousand dollars on the day he exercised the right; the remainder of the purchase price was to be paid in sums of five thousand dollars each at the end of each year thereafter and the deferred installments were to draw three per cent interest from their date until paid, and it was further provided that the ten cents per ton on all number nine coal mined and five cents per ton on all number eleven coal mined was to be paid to Forsythe on the first day of each month for the coal mined the preceding month, and the said monthly payments were to be credited on the payments last due, and Forsythe was given the right to declare the whole amount due should any installment or the interest thereon not be paid at maturity.

It was a carefully drawn contract, in great detail, and drawn by the counsel of Forsythe, Hogg at the time not being represented by counsel. The parties were dealing at arms' length, and wrote into the instrument in great detail the agreement between them.

Under all the rules of equity, there can be no good reason pointed out why a court of equity should not enforce this contract and uphold the right of these plaintiffs to a specific performance.

The judgment of the lower court to the effect that appellee had never accepted the deed to the forty acres of minerals in Hopkins county as a payment is manifestly erroneous. That deed was delivered to appellee about the time the contract was entered into; the evidence shows that it conveys a good title, and appellant kept that instrument in his possession at all times until after he concluded on the 11th day of April to declare this forfeiture. In that interim he had discussed this

proposition many times with Mr. Hogg and once or more with Mr. Hogg's attorney, who was investigating the title to the property, and never once did he indicate any dissatisfaction whatsoever with that deed or the title to the property therein conveyed to him as part payment. Unmistakably, under these circumstances, he must be presumed to have accepted that instrument as a credit upon this lease contract, that being the purpose for which it was executed, as shown by the terms of the lease itself.

But it is said that appellants have forfeited all their rights under this lease by reason of the provisions of section 2292, Kentucky Statutes. That section reads as follows:

"Unless the landlord consents thereto in writing, every assignment, or transfer of his term or interests in the premises, or any portion thereof, by one who is a tenant at will or by sufferance, or who has a term less than two years, shall operate a forfeiture to the landlord, who, after having given the occupant ten days' written notice to quit, may re-enter and take possession, or may, by writ of forcible entry or detainer, or the proper procedure, recover possession of the premises from any occupant thereof, whoever he or she may be."

This statute by its terms applies only to the assignment of leases by tenants at will, or by sufferance, or who have terms for less than two years, and is a statutory inhibition against the assignment or transfer of such leaseholds by such tenants.

But clearly it could have no application to such a lease as is here involved; while the lease as a lease is one for a term of only one year, there is fixed and engrafted upon that lease a right within that time of the lessee to purchase the property, and to say that such a valuable right might not be assigned and was prohibited by that statute, would be carrying it to such lengths as its framers could never have imagined.

The important part of the contract here involved was the right of purchase, and the rather unusual mode of payment provided therein; and these are the things that make it particularly and peculiarly valuable to the appellants.

We have no hesitancy in saying that the statute so quoted has no application to a lease which is coupled with a right to purchase.

Pending this litigation and the appeal of this case appellants, by the wrongful act of appellee, have been deprived of the benefits of their contract; the lower court declined to enjoin the defendant from declaring and enforcing an unconscionable forfeiture. In the meantime under the terms of the contract their valuable rights have been foreclosed by the expiration of time, and we have concluded that because of the erroneous action of the circuit court in refusing to enjoin the enforcement of this wrongful forfeiture, that upon the return of this case the court should either enter a judgment placing the plaintiffs in possession of the property for the period of eleven months, which is the time of which they were deprived by the wrongful forfeiture, or they shall be given the option to prosecute further an action for damages against the appellee because of such wrongful forfeiture.

The prayer for damages in this action was only for such as had accrued up to that time and was prayed for in connection with the prayer of plaintiffs for an injunction, but the case was not prepared in the lower court on the damage feature in such way that this court could enter a fair and intelligent judgment fixing the damages. For that reason, upon the return of the case, the plaintiffs may exercise their option either to be placed in possession of the property for eleven months—that is, placed as far as may be in the position they were in on the 14th day of April, 1919—or they may prosecute against Forsythe their action for damages because of his wrongful forfeiture, and either party may amend their pleadings.

On the cross-appeal it is necessary to say little. The lower court gave to appellant a judgment against appellee for the actual money which he had expended on the property of the appellee and the material which had been left thereon, and we see no reason to disturb that judgment.

The judgment is reversed on the original appeal for such further proceedings as may be consistent with this opinion, and the judgment on the cross-appeal is affirmed.