### Garvin v. Steen et al.

(Decided March 25, 1932.)

JAMES & JAMES for appellant.

DOWLING & BAIRD, MAX B. HARLIN and JOHN E. RICHARDSON for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Affirming.

J. P. Steen and J. B. Miller brought this action in equity against A. L. Garvin to enforce specific performance of a written agreement made by Garvin by which he agreed to sell and convey to them one-half of the royalty in a tract of land in Hart county. The issues were made up. Proof was taken, and on final hearing the court entered judgment in favor of the plaintiffs. The defendant appeals.

A. L. Garvin owned 44 acres of land in Hart county adjoining a smaller tract owned by his mother, Lou Garvin. On September 19, 1930, A. L. Garvin executed an oil lease on this land, and his mother executed, about the same time, a like lease on her land. On October 1, the

following contract, drawn by the county clerk, was made between appellant Garvin and Miller and Steen:

"This contract or option, executed in duplicate, this the 1st day of October, 1930, by and between A. L. Garvin of R. F. D. No. 2, Horse Cave, Hart County, Kentucky, party of the first part, and J. P. Steen and J. B. Miller of Hiseville, Barren County, Kentucky, parties of the second part.

"Witnesseth: That the first party is the owner of a fee simple title to 44 acres of land, lying, being and situate in Hart County, Kentucky, on south side of Green River and about 3 north-eastwardly from the village of Uno, and

"Whereas, said first party has leased said 44 acres of land to M. T. Coats and others for the purpose of drilling for oil and gas and said first party has retained therein a one-eighth part of all oil, gas, etc., as a royalty, all of which is set up and described in said lease, dated September 19, 1930, and duly recorded in Deed Book 12, p. 57, Hart County Court Clerk's office.

"Now therefore, for and in consideration of the sum of One (1) Dollar, cash in hand paid, the receipt of which is hereby acknowledged, the said first party does hereby bind and obligate himself, his heirs, assigns or administrators or executors to convey to the second parties herein a one-half undivided interest in said one-eighth royalty retained in said lease hereinabove referred to, subject to all the terms and conditions of said lease, upon the payment in cash to the first party by the second parties of the sum of One Thousand (1,000) Dollars, within fifteen (15) days from date hereon, and if said parties of the second part should fail to pay said $1,000, in cash on or before fifteen days from date hereon, then and in that event this instrument to be and become null and void.

"Witness my hand this, the 1st day of October, 1930. "A. L. GARVIN, First Party.
"J. B. MILLER, Second Party.
"J. P. STEEN, Second Party.

"Acknowledged before me in due form of law by A. L. Garvin, J. B. Miller and J. P. Steen, October 1, 1930,
"W. H. ATTERBERRY, C. H. C. C."

Steen and Miller at the time the contract was made and pursuant to the contract made, and pursuant to the oral contract between them, paid Garvin $25, and to state their agreement a little more clearly the following additional writing was signed:

"Munfordville, Ky., Oct. 1, 1930.

"If my one-half interest (½) in royalty rights in 44 acres, located in Hart County, Kentucky, is sold for $1,000 in (15) Fifteen days, I agree to refund to J. B. Miller and J. P. Steen, $25.00.
"A. L. GARVIN."

Before the contract was made, an oil well had been put down on the McKinney farm, something over a mile from the land in controversy, and was a producer. Another well had been put down on the Richardson farm, lying between the McKinney farm and the land in controversy, and this was a dry well. A well had been started on the land of Lou Garvin, and on October 1 had been drilled to a depth of about 450 feet; the oil-bearing sands being at a depth of about 700 feet. On October 1, Steen and Miller were at the well and saw M. T. Coats, who was drilling the well and told them that gas had been struck. They told him that they would try to get an option on the royalty from A. L. Garvin on his land, and Coats said if they did he would go in with them. They went to see Garvin, who was some twelve miles away, at a remote place, on account of a threatened prosecution for living with a girl to whom he was not married. Miller knew Garvin. They found him at his car in the road and after some preliminaries told him their business. He said he had been offered $500 for one-half of his royalty. Miller asked him if he would take $1,000 for it and give them fifteen days to get the money. He agreed to this and they had a parol agreement that they would give him $25 for an option, with understanding that they would pay $975 more if they took it and if they didn't he was to keep the $25. He got in the car with them and went to Munfordville to have the contract put in writing, and the clerk wrote out the contract, making the option thirty days. Garvin objected to this and so the contract was changed to read fifteen days, and was then signed, acknowledged, and recorded. They gave Garvin a check for $25, and took him to his home. The

next morning he got in his car and went over to his mother's. He was at his mother's from time to time and well knew that the well was being put down on her land. That morning he went to the well, smelled the gas, and after looking around there he went down to Horse Cave and there cashed the check for $25, which Steen and Miller had given him and paid an insurance premium which he owed. While there he saw Goebel Perkins, who had been looking after his business for him, and learned from Perkins that he had sent Miller and Steen to see him. Garvin then went back to his mother's and she complained of his having given the option to Miller and Steen. He says after this, and on that day, he offered Steen a check for $25 and proposed to cancel the contract, and that Steen declined to accept it. Coats went on boring the well, and oil was produced on October 8, although when they stopped boring on October 6, they thought they had a dry well. About October 8, and within fifteen days from the date of the option, Steen and Miller tendered Garvin $975 and demanded a deed. He refused to make the deed and then offered them a check for $25, which they declined to accept and promptly brought this suit.

It is earnestly insisted for appellant that he had the right to withdraw the offer, because (1) it was an offer to sell an expectancy; (2) it was procured through fraud; (3) it was not on a sufficient consideration; (4) it was a gambling contract.

1. The contract was not one for the sale of an expectancy. The lease had been made. The right to a royalty was retained in the lease. This right was property. Eager's Guardian v. Pollard, 194 Ky. 276, 239 S. W. 39, 43 A. L. R. 808; McIntire's Admr. v. Bond, 227 Ky. 607, 13 S. W. (2d) 772, 64 A. L. R. 630. A contract to sell such property is not the sale of an expectancy, but the sale of a present right. Gillispie v. Blanton, 214 Ky. 49, 282 S. W. 1061.

2. There is no evidence of fraud if the testimony of Miller and Steen is true. There was no one else present when the conversation took place, and Garvin's own testimony does not clearly show that any fact was misrepresented. It is true that they did not tell him that the gas had been struck in the well on his mother's land, but he knew that the well was being bored and went to the

well the next morning and knew that gas had been struck and after this went to Horse Cave and cashed the check. When he went to Horse Cave, he knew as much about the circumstances as Miller and Steen knew. The court gives some weight to the finding of the chancellor on the facts, and under this rule the judgment cannot be disturbed on the ground that any fraud was practiced.

3. The consideration for the fifteen days' option was $25 cash. It is earnestly insisted that such a consideration is not sufficient to support the contract and warrant a judgment enforcing it. The rule is that a contract resting upon a valuable consideration is valid. Certainly $25 cash in hand paid is a valuable consideration. The contract being valid may be enforced in the absence of actual fraud, unless the consideration was so grossly disproportionate to the risk as to amount to constructive fraud. Garvin was thirty-nine years old; he had served in the United States Army; he had lived in Louisville ten years and dealt considerably in real property; he writes a good hand and testifies intelligibly. He owed $900 purchase money on this land and from his conduct at Horse Cave when he cashed the check seemed pleased with the bargain he had made. He got $25 for the risk. The consideration was not so inadequate as to amount to a constructive fraud; for no one could know for certainty what would develop when the well was bored deeper—as late as a week later, it was thought to be a dry hole. Cox v. Burgess, 139 Ky. 699, 96 S. W. 577, 29 Ky. Law Rep. 972.

4. In Walton v. Franks, 191 Ky. 34, 228 S. W. 1025, 1026, the rule is thus stated:

"An agreement by one to sell and convey land to another for a stated price, if based upon a proper consideration, may be specifically enforced upon acceptance and tender of the price within the time fixed by the contract, and it is not a valid objection in such case that prior to acceptance and tender no obligation rested upon the optionee to purchase. Such an optional agreement to pay, made upon a sufficient consideration, cannot be revoked by the optioner within the period granted for an exercise of the option."

The contract in this case was not a gaming contract within the meaning of section 1955, Kentucky Statutes.

The parties simply paid Garvin $25 for the option to purchase one-half of the royalty on the land in question in fifteen days. It cannot be distinguished from other like contracts, but for the fact that at this time a well was going down on another tract of land adjoining this land. It was simply an optional contract for the purchase of an interest in the royalty.

It was shown in the evidence that after the contract was made Miller and Steen told Coats what they had done and he said he would go in with them on it and paid Steen about $9.00, being his one-third of what they were out. But when Garvin declined to carry out the contract and make the deed, Coats being interested in the lease, and not wishing to have any trouble with Garvin, declined to press Garvin for the deed and Steen then paid back to him what he had paid. This left Miller and Steen where they were at the begining. The whole arrangement with Coats was verbal. When the verbal agreement between them and Coats was abandoned by both parties, it left them where they would have been if this verbal agreement had never been made and they had the right to enforce their contract with Garvin.

Lastly, it is earnestly insisted that the plaintiff's remedy was for damages for breach of the contract, and that they should have been confined to this relief rather than the enforcement of the contract. But when a contract is violated the plaintiff may have the contract enforced and not be required to look to an action for damages, for that may, in many cases, be an inadequate remedy. In such cases the plaintiff is entitled to have what he bought and no other remedy would give him complete relief. Bejamin v. Dinwiddie, 226 Ky. 106, 10 S. W. (2d) 620; 3 Elliott on Contracts, sec. 2280.

Judgment affirmed.