## Simmerman v. Fort Hartford Coal Co.

June 7, 1949.

Otto C. Martin and Cleon K. Calvert for appellant.

Hubert Meredith for appellee.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

## Statement of the Case

On May 29, 1935, appellant executed to appellee a lease covering the No. 9 vein of coal, and such coal as

may lie beneath No. 9 vein, under 1033.95 acres of coal lands in Ohio County for a period of five years with the option to the lessee, by giving notice as specified in the contract, to extend the lease for an additional five years. By the terms of the lease appellee was to pay appellant five cents per ton royalty on all coal mined and removed from the property during the term of the lease or any extension thereof. Under section 7 of the lease, appellee was given the option to buy the coal at any time during the term of the lease, or extension thereof, at $25.00 per acre, surface measurement, and it was specifically provided that in the event appellee elected to exercise the option to purchase the property, the royalties paid prior to the election to purchase should be credited on the purchase price. Since section 7 is the section of the lease principally involved in this suit and the one sought to be enforced, we set it out in full: "It is further agreed and understood, that at any time during the life of this lease, or any extension thereof, the party of the second part has the option to purchase said coal for the sum of twenty five ($25.00) dollars per acre, surface measurement; but said option to purchase does not *exceed* (sic) to any part of the above described property, it being understood that the party of the second part will buy all of the above described coal and will pay for it at the rate of twenty-five dollars ($25.00) per acre for all of the surface mentioned above if it exercises its option to purchase at all. It is further understood that if said option to purchase shall be exercised, then all sums of money paid by the party of the second part to the party of the first part as royalty under this lease, prior to the date of its purchase, shall be credited on the purchase price."

On May 29, 1940, the lease and option was extended for an additional five year period under its provisions by appellee giving appellant written notice. In 'April 1943, during the second five year period, appellee notified appellant of its election to exercise its option to purchase the coal underlying the land at the price agreed upon in the lease contract. Appellant, on August 3, 1944, declined to make the deed and on August 16, 1944, appellee brought this suit for specific performance to enforce the contract alleging that it had paid royalties under the contract to the extent of $27,569.98 which was $966.98

in excess of the amount appellee would be required to pay at the agreed price of $25.00 per acre under the option to purchase. It prays that appellant be required to execute to it a deed conveying to it the coal and mining rights under the lands described in the petition pursuant to the terms of the contract.

By answer and counterclaim and three amendments, thereto appellant in paragraph (1) admits the execution of the contract; pleads (2) that there was no consideration for the agreement to convey the property under its terms; (3) that before appellee gave appellant written notice of its election to exercise the option to purchase she had given appellee notice of the withdrawal of the option to purchase said property under the contract; (4) that said contract is invalid, void and unenforcible because of the breach by appellee of its terms and conditions by failing to keep accurate accounts and render her monthly statements of all coal mined under its terms; (5) that appellee has violated the terms of the contract by failing to mine and pay for as much coal per year as the contract called for thus forfeiting its rights thereunder; (6) that appellee had violated the terms of the agreement by its failure to use approved methods of mining so as to meet requirements of the state mining inspector; (7) that said contract was rendered invalid because the contract had been materially altered by the action of appellee in changing the number of acres in particular tracts set out in the lease without consent of appellant; (8) that at the time the contract was executed she was a widow, was in ill health and not competent to take care of herself in a business matter of this importance and that it would be unjust and unfair to require her to convey this property for the price mentioned in the contract which she alleges is about one-fourth of its value; (9) that appellee was guilty of laches in failing to exercise its option to purchase until after it had operated eight years under the royalty provisions of the lease and after the property had become more valuable by our entry into the war; (10) that the contract is a unilateral one in that it is not equally binding on both parties because there is nothing to compel appellee to purchase the property at any time within the option period; (11) that appellee has mined 1,200,000 tons of coal during the terms of the lease which it has.

not accounted and paid for and is indebted to appellant for additional sums of $598.82 for minimum royalties for certain years making a total of $60,598.82 which she claims appellee owes her and she counterclaims for this amount.

All affirmative matter in the various answers and the counterclaim was controverted by replies or agreements filed, thus making up the issue. Considerable testimony was taken on both sides and upon submission of the case on the pleading, exhibits and proof, and after giving his reasons therefor in a comprehensive and well considered opinion, the Chancellor entered a judgment adjudging that appellee was entitled to the relief sought and directing appellant to convey to appellee by general warranty deed all the No. 9 vein or seam of coal and all seams of coal beneath said No. 9 seam underlying 1033.95 acres of land in Ohio County described in detail in the judgment. This appeal is prosecuted from that judgment.

## The Defenses Considered

It will not be necessary for us to consider the defenses set up in paragraphs three to seven of appellant's answer which are briefly summarized above after the numbers 3 to 7 inclusive. Our reason for this is that they are not important in the decision of this case or have not been established by any substantial evidence or that the particular defenses relied on therein, such as that appellee first breached certain provisions of the agreement, were waived by appellant's failure to insist on compliance therewith and her continued acceptance of royalties under the lease as though all its terms were being complied with. Furthermore since none of these defenses are considered and relied on in appellant's briefs, we shall consider them waived on this appeal in accord with our usual custom in such matters.

The remaining defenses relied on by appellant will not be considered in the order in which they are set up in the answer because they overlap and merge to a great extent in the proof and in briefs of counsel. Because it is the foundation of the defense and is the principal ground relied on to defeat this action for specific performance, both by the proof and in briefs of counsel, we

shall first consider the defense set out in paragraph 8 of the answer, which is, that at the time of the execution of the contract sued on appellant was a widow, was in ill health and not competent to take care of herself in a business matter of such importance, did not know the value of coal properties and that it would be unjust and unfair to require her to convey this property to appellee under the terms of the contract, which would be less than one fourth of its value.

At the time this contract was entered into in 1935 appellant was sixty years of age. Her Husband, R. E. L. Simmerman, was a lawyer until his death in 1930. She had lived all her life in Hartford in Ohio County and was the only child of James W. Ford, a prominent citizen of that county who died in 1927, and from whom she inherited a large estate including the approximately 1000 acres of coal land involved in this litigation. She has one child, a daughter, Winifred Simmerman, who has had a college education, is apparently a woman of intelligence, and has always lived with her mother. Appellant, according to her proof, had always lived a sheltered life and during the life of her husband and of her father, she had no financial responsibilities nor any opportunities to acquire any business experience. Her husband became involved in the failure of the Bank of Hartford, which failed in 1926, and her father's estate was also involved in that failure. She contends that the worries she went through in connection with the liquidation of the bank's affairs together with illness, which began in 1924 and has continued up to the present time, rendered her unfit to transact any important business. She says she had to quit school while quite young because of poor health. On the whole she pictures herself as uneducated, inexperienced in business, in poor health and distressed in mind and body, and was therefore not in a position to cope with an experienced business man like Mr. Holt, president of appellee, when the contract was executed in 1935. On the other side it is shown that she is a woman of average, or more than average, intelligence who managed her estate in a capable manner, and it was shown by the records of the county clerk's office that she had bought, sold and mortgaged property in numerous transactions both before and after the time of the execution of the contract here involved.

578

The proof is conflicting as to whether Mrs. Simmerman first approached Mr. Holt or whether he approached her with reference to leasing the property involved. He says she first suggested it to him in a downtown store while she says he came to her house and asked her to lease the property to him. At any rate, after several conferences on the subject they reached a tentative agreement. Mrs. Simmerman was to have the lease drawn and, in order to have it done, Mr. Holt furnished her with a memorandum roughly sketching the terms of the lease, such as the royalty to be paid, length of term, etc.

There is direct conflict in the testimony as to who had the agreement drawn up. Mrs. Simmerman and her daughter both testify positively that they did not have it drafted and that they did not know who did draft it, while Mr. Holt is equally positive that he did not have it drawn. It seems certain that it was drafted by Miller Holland, a reputable attorney of Owensboro and a kinsman of Mrs. Simmerman, who was dead at the time of the trial of this case and who, therefore, could not testify in the suit. The natural inference would be that Mrs. Simmerman turned over to Mr. Holland the memorandum which Mr. Holt left with her and had Mr. Holland draw the contract. The documentary evidence rather indicates that it was drawn by Mr. Holland, possibly for Mrs. Simmerman, at the suggestion of Mr. Holt. This documentary evidence consists of a letter which Mr. Holland wrote to Mr. Martin, attorney for Mrs. Simmerman in this case, under date of September 30, 1946. In that letter he transmits to Mr. Martin two copies of the letter which he had written to Mrs. Simmerman on May 18, 1935, when he sent her two copies of the contract which he had drafted. In this letter to Mr. Martin, Mr. Holland says, "You will note that I was acting under instructions of Mr. Holt who professed to be acting for Mrs. Simmerman." A copy of this letter is filed as an exhibit.

There is also sharp conflict in the testimony as to whether or not Mrs. Simmerman had an opportunity to read or study the contract after it was drawn up by Mr. Holland. Miss Simmerman testified that the two copies of the contract came to her mother in a plain envelope

postmarked "Owensboro;" that they were received late in the afternoon; that she only glanced through them herself but did not let her mother read them because she had had a nervous attack that evening; that they were called early the next morning to the office of Judge Clarence Bartlett, then practicing law in Hartford, for the purpose of discussing the lease; that they went to the office at which were present Judge Bartlett, his secretary Miss Sosh, Mr. Holt and his wife, Mrs. Holt; that they wanted her to sign the lease right away and seemed to be in a hurry to get it signed and it was signed on that day, May 29, 1935. In this she is contradicted by Judge Bartlett, who says he was not present when the contract was signed, and by Mr. and Mrs. Holt who testified that there was no hurry on their part to have the lease signed. Miss Sosh did not testify. She is also contradicted in her testimony that she and her mother had no opportunity to read and consider the contract, by the documentary evidence in the case. This consists of a copy of a letter from Mr. Holland dated May 18, 1935, transmitting to Mrs. Simmerman two copies of the contract which he had drafted. A copy of this letter was filed as an exhibit with the deposition of Miss Todd, long time secretary to Mr. Holland, who testified that she mailed it in an envelope bearing the name and return address of Mr. Holland. Mrs. Simmerman must have received this letter and copies of the contract within the next day or two after its date for on May 21, 1935, she transmitted to Mr. Holt a copy of this contract. Both of these letters, copies of which are filed as exhibits, are copied herewith and are as follows:

"May 18, 1935

"Mrs. Jessie R. Simmerman,

"Hartford, Ky.

"Dear Cousin Jessie:

"I am enclosing a form of coal lease, as suggested by Mr. Holt. You will note that the various tracts are not described but are merely mentioned by name giveing the acreage. I think if the lease is satisfactory that the property ought to be described more accurately by metes and bounds. The lease is in duplicate and the two copies are enclosed. I suggest that you submit it to Mr. Holt, if it appears to be satisfactory to you.

"I am also returning your map of the coal property.

"Yours truly,"

"May 21, 1935

"Mr. B. B. Holt
"Central City, Ky.,
"Dear Sir:

"I am enclosing a form of coal lease as suggested by you. You will note that the various tracts are not described but are merely mentioned by name giving the acreage. I think if the lease is satisfactory that the property ought to be described more accurately by metes and bounds.

"Hoping to hear from you soon, I remain with kindest regards to you and Mrs. Holt.

"Yours truly,
"Jessie R. Simmerman."

It is apparent from these letters and from other evidence in the record that Mrs. Simmerman was in possession of the proposed lease at least eight and possibly ten days before it was executed on May 29, and that she had every opportunity to consult with her daughter, to consult with any business man in whom she had confidence or to consult with an attorney who could advise her on the legal aspects of the contract. If Mrs. Simmerman was ill and inexperienced as she now claims there was nothing to prevent her from obtaining and relying on the advice of others of her choice. The proof does not sustain her contention that she did not read or have an opportunity to read the contract or that she was rushed into its execution or that any unfair advantage was taken of her. It is the rule in this state that a party who can read and has an opportunity to read the contract which he signs must stand by the words of the contract unless he is misled as to the nature of the writing which he signs or his signature is obtained by fraud. United Talking Machine Co. v. Metcalf, 174 Ky. 132, 191 S. W. 881, and cases therein cited. As was said by this court in the case of J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky. 581, 583, 134 S. W. 1131, 1133, quoting with approval a case from the U. S. Supreme

Court (Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203):
"It will not do for a man to enter into a contract, and,
when called upon to respond to its obligations, to say
that he did not read it when he signed it, or did not know
what it contained. If this were permitted, contracts
would not be worth the paper on which they are written.
But such is not the law. A contractor must stand by the
words of his contract; and, if he will not read what he
signs, he alone is responsible for his omission."

Under these authorities and the evidence on this
phase of the case, we agree with the opinion of the Chan-
cellor that the defense interposed by Mrs. Simmerman
that she did not read the contract, did not know its con-
tents and was overreached in its execution is not sus-
tained.

Another defense relied on by appellant to defeat
specific performance is that the contract is unjust and
unfair and if she is forced to convey the property at the
price per acre set out in the contract, it would result
in the sale of the property at about one fourth of its
value. This contention seems to be based on the present
value of coal lands, whereas its value must be considered
in the light of conditions existing at the time the con-
tract was made. The proof conclusively shows that at
the time this contract was made the coal business was at
a very low ebb. In 1935 the depression was still on
and all business was bad but the coal business was
especially sick. Coal lands were not selling and there
was little market for them either on a lease or sale
basis. There is conflict in the testimony as to the pre-
vailing royalty basis of coal production and the prevail-
ing price per acre for sale of the coal rights. Some of
appellant's proof shows that the royalty being paid at
that time was in some instances as high as 10 cents
per ton while appellee's proof shows prevailing royal-
ties at that time were 5 cents per ton with some as low
as 3 cents per ton. There was testimony produced by
appellant that the sale price of coal lands at that time
went as high as $50.00 per acre in that locality while
appellee's proof shows the prevailing price of undevel-
oped coal lands at that time and in that vicinity to be
from $10.00 to $20.00 per acre with little moving at these
prices. From all the testimony we think it was estab-

lished not only by the preponderance of testimony but by what appears to be the better evidence of experienced coal men that the prevailing royalty basis at the time this contract was made was 5 cents per ton and that a price of $25.00 per acre, surface measurement, was a little above or about the prevailing price at that time and was a reasonable price for sales of coal on an acreage basis and both were fair prices in view of the condition of the coal business at that time. We think the Chancellor was justified in his finding of fact on that point. Appellant appears to have been satisfied with the royalties she was receiving during the eight years she received them and made no complaint and apparently was satisfied with the acreage price that was agreed on in the contract. The thing that caused all the trouble and which could not have been foreseen at the time was the tremendous impetus given to the coal business by our entry into the World War in 1941 and the resultant advance in coal prices. It was this advance in price and the great increase in the demand for coal that no doubt brought home to appellee a realization of the advantageous contract it had made and caused it to exercise in 1943 the purchase option provided for in section 7 of the contract. It also no doubt caused appellant to realize that she had made an unwise contract and has caused her to resist appellee's efforts to enforce specific performance. But the contract must be viewed in the light of the time and the conditions prevailing when it was executed, not in the light of conditions as they existed at the time its provisions were sought to be enforced, and the fact that it has become a hard one by force of subsequent circumstances or changing events will not necessarily prevent its specific performance. Harris v. Greenleaf, 117 Ky. 817, 79 S. W. 267, 4 Ann. Cas. 849, and 25 R. C. L. 253, Sec. 56.

Appellant lays great stress on that clause in section 7 of the contract above quoted which provides that if the option to purchase the property is exercised by the lessee, all royalties paid to the lessor up to that time shall be credited on the purchase price and since these paid royalties have exceeded the total purchase price, it would in effect, she contends, make her pay herself for her own property out of her own royalties which she has received. We do not hesitate to say that we

think such an agreement was unwise from appellant's standpoint although it may be a feature of such contracts in the coal trade. There was a similar clause in the contract involved in the case of Hogg v. Forsythe, 198 Ky. 462, 248 S. W. 1008, in which case the contract was upheld and specific performance decreed. But it is not for us to determine the wisdom of the contract which the parties entered into or to make a new contract for them, but to enforce the contract as agreed on between the parties unless some valid reason is shown as to why it should not be done.

We will now consider the remaining three reasons relied on by appellant and set up in paragraphs 2, 9 and 10 of this answer and heretofore listed in this opinion under those numbers. The ground relied on in No. 2 is that there was no consideration for the agreement to convey the property under its terms. The ground relied on in No. 10 is that the contract is a unilateral one in that it is not equally binding on both parties because there is nothing to compel appellee to purchase the property at any time within the option period. We will consider these together since they involve somewhat the same principle and the same authorities. To determine whether there is consideration for the contract it must be considered as a whole, the lease, the option to purchase during or at the termination of the lease and the method of paying the purchase price if the option is exercised. The contract cannot be separated into two distinct parts. It may be that appellee would not have leased the coal and agreed to pay royalties but for the option to purchase and to have these royalties applied to the purchase price, as the president of appellee company testified he would not have done. Therefore the lease and the royalties to be paid thereunder and the option to purchase all the coal including the coal which had been taken, by surface measurement, and the application of royalties on that which had been taken to the payment of the purchase price, constitute one contract supported by consideration. Nor can it be said that there was no mutuality, as appellant contends, because appellee had power to exercise the option or let it pass. Of course this is true of practically all lease and option contracts. Such contracts have long been in use and are almost universally upheld as against contentions that they are

unilateral. As was said by this court in the case of Montanus v. Buschmeyer, 158 Ky. 53, 164 S. W. 802, 803; ''This court has frequently upheld the validity of an option to purchase premises during or at the termination of a lease, although it was conceded that the lessee could not be compelled to exercise such an option. Taken separately—that is, not in connection with the other parts of the contract—such an option is unilateral, but this court has upheld them because they are a part of the contract as a whole, and considered as inducements or considerations actuating the parties in the beginning.'' (Citing cases.)

Other Kentucky cases so holding are Cleveland Wrecking Co. v. Aetna Oil Co., 287 Ky. 542, 154 S. W. 2d 31, 137 A. L. R. 352, and Garvin v. Steen, 243 Ky. 256, 47 S. W. 2d 1010. See also 49 Am. Jur., Sec. 120, page 141, and 137 A. L. R. 375. Under these authorities and the facts in this case we cannot say that the contract was not supported by consideration or that it cannot be enforced because of any lack of mutuality.

The last remaining defense set up by appellant in her answer and relied on to defeat specific performance was that appellee was guilty of laches by failing to exercise its option to purchase until after it had operated eight years under the royalty provisions of the contract and after the property had become more valuable by our entry into war with the consequent change in conditions in the coal business. Under the terms of the contract appellee had the right to purchase the property any time during the lease or any extension thereof. It could have exercised this option on the first day or the last day of its operations thereunder. If the price of coal and coal lands had gone down, it did not have to exercise its option at all. Instead they enhanced in value and appellee had the right to rely on its contract and exercise its rights thereunder when it was to its advantage to do so without being guilty of laches by failing to exercise it at some other time. Laches in a legal sense is not merely delay, but delay that works a disadvantage to another. We fail to see how the delay worked to the disadvantage of appellant because she was bound by the terms of the contract until it expired and whether the option was exercised early or late she was to receive

the same price of $25.00 per acre. We do not think the plea of laches is applicable in this case.

## The Counterclaim

Appellant's counterclaim is based on the contention that appellee did not pay to appellant all that was due her at the 5 cent per ton royalty under the contract. Appellee paid appellant for 551,399 tons totaling $27,569.98 as shown by vouchers filed in the record. These figures were computed from coal actually shipped from the mine or used in local steam engines on the local railroad supplied by the mines. Appellant has not shown by proof that these figures are not correct. Her contentions that appellee mined 1,200,000 tons of coal during the period was based largely on her proof that the seam of coal was about four feet thick and should produce about 7300 tons to the acre and that appellee had mined out about 148 acres. This method of calculation is largely theoretical and speculative since it does not take into account coal that is left and not mined or faults in the seam or bad roof conditions and other contingencies. The best test of how much coal is actually mined is the number of tons marketed and appellant has not shown that appellee's figures as to the number of tons mined are not correct. We agree with the findings of the Chancellor on this question of fact that in the absence of more definite evidence, it cannot be said that appellee has not accounted for all the coal mined and marketed from the leased premises. He dismissed the counterclaim for this reason.

For the reasons herein indicated the judgment of the lower court is affirmed.