## CROWELL LAND & MINERAL CORP. v. UNITED STATES.

Civ. No. 2855.

United States District Court
W. D. Louisiana, Alexandria Division.

Aug. 24, 1953.

Richard L. Crowell and W. C. Roberts, Alexandria, La., for plaintiff.

T. Fitzhugh Wilson and Mason P. Gilfoil, Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiff demands $45,529.15 as the alleged value of some 37,135 lineal feet of cast iron pipe which the Government furnished and used in laying a gas line under lands leased from the plaintiff, to supply natural gas to Camp Claiborne located some 17 miles south of Alexandria, Louisiana, during the Second World War. Plaintiff contends first, that the pipe was forfeited to it by the failure of defendant to remove the same from the ground within the period required by the lease and that defendant took it up under circumstances amounting to a tort.

Defendant answers that the pipe was removed within the provisions of the lease, with only such delays as were caused "by action on the part of the plaintiff".

The case has been submitted on stipulations of fact, with attached exhibits, and the pleadings, without oral argument, on briefs. There is therefore no dispute as to the facts, and both sides have moved for summary judgment.

Accordingly the facts are as follows: As owner of certain lands, plaintiff's predecessor in title Crowell & Spencer Lumber Company, Ltd., entered into a lease with the Government for a strip 30 feet wide under which the pipe was laid and used. Pertinent parts of the lease are quoted as follows:

"* * * Grantor, does, by these presents, grant and convey unto United States of America, herein represented by Lieutenant-Colonel C. H. Menger, Construction Quartermaster, United States Army, Alexandria, Louisiana, hereinafter designated as Grantee, the right of way, easement and servitude, not to exceed thirty (30) feet in width, to construct, maintain and operate pipe lines and appurtenances thereto, over and through the following described lands situated in the Parishes of Evangeline and Rapides, Louisiana, to-wit:

* * * Description omitted * * *

"To have and to hold unto the Grantee, with ingress to, and egress from, the premises, for the purpose of constructing, inspecting, repairing, maintaining and replacing the property of the Grantee, above described.

"It is agreed and understood that this contract of right of way, easement or servitude is not transferable

or assignable, with or without consideration, and when said right of way shall cease to be used by the Grantee, for the purposes herein set forth, it shall terminate.

"At the termination of the contract, the Grantee shall have the right to remove any pipe lines or appurtenances placed in or on said right of way."

\*　\*　\*　\*　\*　\*

"It is finally agreed and understood that this right of way, easement and servitude is granted for a period not exceeding the time during which the United States Government shall use said pipe line to furnish gas to the army camps in what is now known as Camp Claiborne area.

"At the end of said period, the Grantee shall have one (1) year within which to remove said pipe line."

On April 11, 1946, Camp Claiborne, by Surplus Property Declaration WD 638, was certified to the War Assets Administration "for disposal", and the latter, on December 20th of that year, "assumed custody"; the original declaration of surplus "\* \* \* did not include the right-of-way \* \* \*" but on June 27, 1947, the certificate was amended "to include the right-of-way". Prior thereto on December 9, 1946, the Army Corps of Engineers by letter advised the United Gas Pipeline Company that "effective December 20, 1946, the War Assets Administration was assuming custody of Camp Claiborne," and to therefore bill "it for the gas run through said line, rather than the War Department as had theretofore been done".

The following is quoted from the stipulation of facts:

"That more than a year elapsed from the time that Camp Claiborne was certified to the War Assets Administration for disposal, and from the time the said Administration assumed custody thereof, and likewise from the date of the corrected declaration of surplus, before any action was taken by the United States or by any of its departments, agencies or representatives, or any other party, to remove the pipelines lying on and under the lands involved herein.

"That by letter dated February 20, 1948, the War Assets Administration advised the United Gas Pipeline Company to shut off and discontinue gas service as of February 26, 1948; that gas was run through said gas pipelines up to and through February 26, 1948, and thereafter the said gas service was completely shut·off and all service discontinued.

"That on January 5, 1949 complainant, by written communication, advised the War Assets Administration, Washington, D. C., a copy being sent to its regional office in Dallas, Texas, that the right-of-way, ·easement and servitude granted by the Crowell and Spencer Lumber Company, Ltd. unto the United States of America ·by instrument dated December 1, 1940, over and through certain parts of its lands in Evangeline and Rapides Parishes, Louisiana, had terminated and expired according to the terms and provisions of said grant, and that the period for removal had also expired; all as shown by a copy of said communication hereto annexed and made a part of this stipulation.

"That on or about January 28, 1949, the United States of America, acting by and through the War Assets Administration, entered into some form of agreement with the Louisiana State Penitentiary, Angola, Louisiana, purporting to sell to said Penitentiary the gas transmission lines in controversy, the validity, terms and conditions of said agreement being unknown to complainant, and in which agreement complainant has never at any time acquiesced in any manner; that thereafter, one J. E. Tyler, purporting to be acting under contract with the Louisiana State Penitentiary, began to remove the pipe in question in this suit, located on and under the lands, and that an injunction was obtained by complainant prohibiting the removal of the pipe by the said Tyler in both

Evangeline and Rapides Parishes, Louisiana; that J. E. Tyler was not acting for the United States in removing the pipes and the United States of America was not a party to these proceedings and, therefore, is not bound by the injunctions.

"That the representatives of the War Assets Administration, Camp Claiborne, Louisiana, and in Washington, D. C., had full knowledge of the institution of said proceedings and of the nature of both proceedings hereinabove referred to, and of the ruling of the said two State of Louisiana district courts, and a representative of the Justice Department of the United States was present in court during the trial of these suits; that, even so, the United States of America did not intervene or become a party to said suits and did not therein make claims against said pipe or otherwise.

"That the War Assets Administration, through its agents, representatives or employees, and without the consent or authority from claimant, went upon the lands involved in Evangeline and Rapides Parishes, Louisiana, during the month of April, 1949 and commenced the removal of the pipe or pipelines located on and under said lands and completed the removal of this pipe during the month of June, 1949.

"That the agents, representatives or employees of the War Assets Administration were at all times, as hereinabove set forth, acting within the scope of their office, authority and employment in the removal of said pipe.

"That the representatives of the United States of America removed from said lands in Evangeline and Rapides Parishes, Louisiana, a total of 37,135 feet of standard gauge pipe (6⅝″ x 0.280″).

"That prior to the filing of this complaint, complainant presented the claim herein sued upon to the War Assets Administration in Washington, D. C. for disposition, and was advised by its General Counsel, under written communication dated July 5, 1949, that said claim was rejected; that again, by communication dated October 7, 1949, Admiral Paul L. Mather, Liquidator of General Services Administration, succeeding agency of said War Assets Administration, advised that said claim was rejected; that said communications, or either or both of them, constituted a final administrative determination or decision of the claim herein sued upon; all as shown by copies of said communications annexed hereto and made a part of this stipulation."

On June 28, 1949, the Government, acting through the War Assets Administration, sold the pipe in question to the Louisiana State Penitentiary for the sum of $58,579.30.

This Court is called upon to interpret and apply the reasonable meaning of those portions of the lease above quoted, in the light of the pertinent law, to the facts as disclosed and thus found.

As shown by Articles 6, 7, 8, and 9 of the stipulations, gas ceased to move through the pipe line on February 26, 1948, and the Government, acting through the War Assets Administration, contracted to sell the pipe to the State Penitentiary. The latter employed J. E. Tyler to remove the pipe from plaintiff's lands and within the year of the ending of the flow of gas, he attempted to remove it but was stopped by injunction decrees in the State Court, from which he took no appeal. The Government was not a party to this litigation.

Having been thus thwarted in efforts to remove and deliver the pipe to its purchaser, the defendant, through its agency, the War Assets Administration, took the pipe up and delivered it to the State Penitentiary, completing the work in the month of June, 1949, a year and some four months after gas ceased to move through the line.

The first question to be determined is, did the year stipulated in the original lease begin to run when Camp Claiborne was transferred to the War Assets Administration, a Governmental agency, or did the lease reasonably contemplate that it would

start when the need for the use of the gas had ended, including the liquidation of the assets and property constituting Camp Claiborne?

In the first place, as the lease discloses, the right-of-way was conveyed for a particular purpose, under emergency conditions and in anticipation of probable war, and all concerned, it would seem, were charged with knowledge of the facts that no one could say how long its use would be needed. It must also be conceded, it is believed, that in view of the vast efforts at preparation for and prosecution of the war tremendous expenditures would be made in hundreds if not thousands of army camps and other facilities, which when the war ended could not be immediately liquidated, and that varying periods would be necessary to do this as economically and advantageously as possible, including the use of the natural gas by the agencies charged with the duty of performing this service.

The lease declares that the right-of-way is conveyed to permit the Government "to construct, maintain and operate pipe lines and appurtenances thereto * * * with ingress to and egress from, the premises, for the purpose of constructing, inspecting, repairing, maintaining and replacing the property of the Grantee (the Government) above described". Further, that "when said right-of-way ceases to be used by the Grantee for the purposes herein set forth, it shall terminate"; and

"It is finally agreed and understood that this right of way, easement and servitude is granted *for a period not exceeding the time during which the United States Government shall use said pipe line to furnish gas to the army camps in what is now known as Camp Claiborne area.*

"At the end of said period, the Grantee shall have one (1) year within which to remove said pipe."

 The contract is to be construed most strongly against the obligor, the plaintiff in this case, LSA–C.C. Art. 1957. In this instance it was to furnish the right-of-way "for a period not exceeding the time during which the United States Gov-

ernment shall use said pipe line to furnish gas to the army camps in what is known as Camp Claiborne area". It did not say while the war was in progress or soldiers actually occupied the camp. (The agreement was made before this country got into the war.) Nor did it say while gas was being furnished for the use of the armed forces, but so long as it was used by the camp. This was broad enough to include the time reasonably required to liquidate its assets in an orderly manner. It cannot be seriously contended that the possession of this agency was not for the Government or that in making the contract, the parties did not foresee the necessity for using the gas for the purposes of liquidating the camp.

It would seem to follow that the delay of one year began on February 26, 1948, when the Government actually ceased using the pipe to furnish gas to Camp Claiborne. If we applied the plaintiff's theory of forfeiture of the pipe, this could not have happened until February 26, 1949. Tyler, for the State Penitentiary, within that period attempted to remove the pipe, but was stopped by suits in the State Court, which had the effect of suspending the running of the time otherwise, if those actions were not sustainable. The Government, Grantee and defendant in the present case, was no party to those State actions and could only be sued in this Court. To the extent that the Penitentiary, through Tyler, was attempting to comply with its contract of purchase, the action enured to the benefit of the United States, as an exercise of the implied right to recoup its property under the lease, and refutes any idea of intentional abandonment.

 On the other hand let us see if the circumstances of this case created a condition whereby failure to remove the pipe would bring about a forfeiture. It is a universal rule that forfeitures are not favored in the law, Hogg v. Forsythe, 198 Ky. 462, 248 S.W. 1008; Town of Mt. Morris v. King, 77 Hun 18, 28 N.Y.S. 281. There was no provision in the contract of lease for forfeiture, if the Government failed to remove the pipe within the stipulated year. It undoubtedly was and remained the property of the United States,

even if the expressed period had expired. A possessor in good faith, even without title to the realty, may require payment for the improvements placed upon the property or for the increased value of the land. Venta v. Ferrara, 195 La. 334, 196 So. 550. In proper cases the Court may allow additional time for the performance of the obligations of the contract where equity requires it. LSA–C.C. Art. 2047 (West's 1952 Ed. Vol. 7 and Citations in footnote).

Plaintiff has cited certain authorities in support of a contention that the Government abandoned the pipe and that the former became the owner by possession. In view of what is shown by the stipulation of facts and the course pursued by the Government in reclaiming and liquidating Camp Claiborne, above referred to, there is no basis for the claim of abandonment. The only Louisiana cases relied upon to support the claim of abandonment seem to be against any such result. They are Standard Oil Company v. Barlow, 141 La. 52, 74 So. 627; Bickham v. Bussa Oil & Gas Company, La.App., 2 Cir., 152 So. 393; and Donnell v. Gray, 215 La. 497, 41 So.2d 66.

In the first of these cases, the Standard Oil Company drilled a well under a lease with the defendant which proved unprofitable and it removed most of the appliances. "About eight months later", when an attempt was made to remove the pipe left in the ground, defendant prevented it from doing so. An injunction was obtained by the company and the pipe removed under its protection. Defendant claimed it had been abandoned and that the land had been damaged. The lower court awarded $125 damages to the land. The Supreme Court found that under the lease plaintiff had the right to remove the property placed upon the land "at any time" and quoted with approval a statement by the trial judge as follows: " 'It is incredible that any oil company should intend to present to a lessor $1,400 worth of pipe, after it had expended $10,000 or more in drilling a well into salt water.' " The judgment was affirmed.

In Bickham v. Bussa Oil & Gas Company the lessee ceased operations for about two years because the price of oil had fallen to where the well drilled was not profitable. In discussing the Louisana law, the State Court of Appeals for the Second Circuit had this to say [152 So. 395]:

"To constitute an abandonment of personal property so as to give a third party the right to assume title and control of it, two essential elements must exist. There must be an act of abandonment coupled with the intention to abandon. We do not have these elements in the case at bar. There is no testimony in the case to show that there was any intention to abandon the personal property involved herein on the lease, nor is there any act of abandonment. The testimony shows that agents of the defendants had continually removed some of the personal property from the lease, and one witness testified that some of it was removed approximately some three or four months prior to the time the suit was filed. There is no reason to believe, from the evidence and testimony in the case, that there was any intention on the part of the defendants herein to relinquish their title to their personal property on the lease."

In the last case, Donnell v. Gray, the State Supreme Court dealt with the situation where the lessee had drilled paying wells upon plaintiff's property but abandoned the lease when production became unprofitable. The lease contained the usual provisions reserving to the lessee the right "to remove from the land all property and fixtures placed thereon by him [215 La. 497, 41 So.2d 67]." Production ceased some time during the latter part of 1945 or early 1946, at which time the lessee "pulled the casing and removed all of his equipment except two tanks and a pumping unit involved in this suit". On June 1, 1946, defendant notified an employee of the lessee to vacate the property "as the lease heretofore executed * * * has expired and is abandoned". The lessee did nothing further toward removing the tanks and pumping unit, but on February 21, 1947, "transferred the disputed property, together with other equipment to plaintiff for a stated consideration of $2,750.00 * * *". Some three months after the transfer, or in May,

1947, the latter "went to defendant's premises in Caddo Parish for the purpose of removing it (the property). " * * * he found that the equipment had been fenced in and locked by defendant" who stated he was holding it as security "for damages to his land * * *". In July or August following, plaintiff made demand for permission to remove the tanks and pump, which defendant refused, unless he was paid the sum of $500 which it was claimed to be due by the former owner. Up to that time he did not claim the property as owner under the theory of abandonment.

The following is quoted from the decision:

"Article 3412 of the Civil Code defines occupancy as a mode of acquiring property 'by which a thing which belongs to nobody, becomes the property of the person who took possession of it, with the intention of acquiring a right of ownership upon it.' And Article 3413 declares that occupancy can only be a lawful mode of acquiring property so long as the thing in occupancy has no owner and 'when it is retained by the acquirer with the intention of keeping it as his own property.' "

The facts in the present case show conclusively that the Government not only never intended to abandon the pipe, but continued to use it for the same purpose for which it was installed until Camp Claiborne was transferred to the War Assets Administration. The latter continued its use to furnish gas until February 26, 1948, after which it was sold to the State Penitentiary who, as stated earlier, attempted to remove the pipe within a year after its use for furnishing gas to Camp Claiborne had ended.

From what has thus been said it follows that the plaintiff was not the owner of the pipe removed; and even if it had been taken up after expiration of the time stipulated in the contract, there is no proof of damages to support a claim of trespass or in tort. See also West's LSA–C.C. Art. 508, 1952 Ed. Vol. 3, and authorities cited in footnotes.

There should be judgment for the defendant, United States of America.