November 23, 1979

**79-82  MEMORANDUM OPINION FOR THE GENERAL COUNSEL, GENERAL SERVICES ADMINISTRATION**

**(1)  Presidential Protection Assistance Act (18 U.S.C. § 3056 note)—Retroactive Effect**

**(2)  Federal Improvements to Real Property Owned by a Former President—Title Thereto— Removal Of**

This responds to your request for the views of the Department of Justice concerning the disposition of Government property located at former President Nixon's San Clemente residence. For the reasons discussed below, we conclude that the Presidential Protection Assistance Act of 1976, 18 U.S.C. § 3056 note, does not apply to the termination of Government services at the San Clemente estate and that the Government is not obligated to restore the property to its original state, as the owner requests. We further conclude that if Mr. Nixon sells the estate, the Government has an arguable right to the portion of the sale price attributable to Government improvements.

**I.**

Your first question is whether the Presidential Protection Assistance Act applies to the termination of Government services at the San Clemente estate. You tell us that all the Government property and improvements were placed on the San Clemente estate prior to the passage of the 1976 Act.

The Act itself does not provide an effective date. The general rule is that a statute takes effect on the date of its enactment if the time is not otherwise fixed by law. *Union Pac. Ry.* v. *Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913); *United States* v. *Gavrilovic*, 551 F. (2d) 1099, 1103

(8th Cir. 1977); 2 J. Sutherland, *Statutes and Statutory Construction* § 33.06 (4th ed. 1973). Statutes cannot be applied retroactively unless the words are so clear and imperative that they can have no other meaning or unless the legislative intent cannot be otherwise satisfied. *De Madulfa* v. *United States*, 461 F. (2d) 1240, 1247 (D.C. Cir. 1972), cert. denied, 409 U.S. 949 (1972). A statute such as this, which may interfere with antecedent rights, will not be applied retroactively unless that is " 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' " *Greene* v. *United States*, 376 U.S. 149, 160 (1964), quoting *Union Pac. Ry.* v. *Laramie Stock Yards Co.*, *supra*. Unless the clear, unequivocal intent of the Congress was that the Act be effective retroactively, it cannot be applied to the disposition of the San Clemente property.

The measure was introduced as a result of a thorough study of expenditures of Federal funds in support of Presidential properties by the Government Activities Subcommittee of the Committee on Government Operations in the 93d Congress. 121 CONGRESSIONAL RECORD 12983-85 (1975). The findings and conclusions of the subcommittee appear in a Committee on Government Operations report, "Expenditures of Federal Funds in Support of Presidential Properties," Fifteenth Report by the Committee on Government Operations, H. Rept. 1052, 93d Cong., 2d sess. (1974). This study was triggered by certain matters involving the Nixon properties at Key Biscayne, Florida, and San Clemente, California. H. Rept. 105, 94th Cong., 1st sess. (Pt. 2) 2 (1975). The subcommittee received information concerning these two locations in a report from the General Accounting Office. General Accounting Office No. B-155950 (1974).

A study of the legislative history reveals no clear intent that the bill be applied retroactively. The House report on the bill states that the bill was designed to correct certain deficiencies in existing law and to tighten loose procedures. The list of things the bill was designed to accomplish does not include rectification of the problems at San Clemente. H. Rept. 105, 94th Cong., 1st sess. (Pt. 2) 1-2 (1975). The recommendations of the GAO formed the basis for much of the bill and, according to Part 1 of the House report, those recommendations were intended to provide for better future controls over expenditures. H. Rept. 105, 94th Cong., 1st sess. (Pt. 1) 5-6 (1975). Similarly, the Senate report reveals only an intent to prevent future irregularities. In its statement on the need for the legislation, examples of abuses at Key Biscayne and San Clemente are recited, but there is no statement that this legislation retroactively would correct those particular abuses. Rather, the report summarizes: "H.R. 1244, as amended, is designed to prevent such misuse of the taxpayer's dollars by placing the responsibility for all expenditures in one centralized place; that is, the U.S. Secret Service." S. Rept. 1325, 94th Cong., 2d sess. 5 (1976).

Although subsequent expressions of congressional understanding of

441

legislation are entitled to very little weight,[1] we note that recent legislation indicates a congressional belief that the Presidential Protection Assistance Act of 1976 is not retroactive. On June 18, 1979, Senator Hart introduced a resolution stating:

> [I]t is the sense of the Senate that the Director of the Secret Service and the Administrator of General Services shall take such actions as may be necessary to obtain reimbursement in an amount by which any construction, renovation, improvements, equipment or articles paid for by the Federal Government of the United States have increased the fair market value of the estate known as San Clemente located in the State of California at the time of and upon its sale by former President Richard M. Nixon. [S. Res. 187, 96th Cong., 1st sess., 125 CONGRESSIONAL RECORD S. 7892 (daily ed., June 18, 1979).]

The resolution was referred to the Committee on Governmental Affairs but no further action has been taken. The substance of the resolution, however, has been adopted as an amendment to a 1979 appropriation bill. Treasury, Postal Service, and General Government Appropriation Act, 1980, Pub. L. No. 96-74, § 616, 93 Stat. 577 (1979). On August 3, 1979, Senator Pryor submitted the amendment (125 CONGRESSIONAL RECORD S. 11725 (daily ed., August 3, 1979)),which was later revised by Senator Hart to parallel more closely the language of the Presidential Protection Assistance Act. 125 CONGRESSIONAL RECORD S. 11814-15 (daily ed., Sept. 5, 1979). As enacted, § 616 provides:

> It is the sense of the Congress that, upon the sale of the estate known as Casa Pacifica located in San Clemente, California, former President Richard M. Nixon should reimburse the United States for the original cost of any construction, renovation, improvements, equipment or articles paid for by the Federal Government of the United States, or for the amount by which they have increased the fair market value of the property, as determined by the Comptroller General of the United States, as of the date of sale, whichever is less.

But the statute's language is permissive, not mandatory. It does not alter the effective date of the Act, nor expressly mandate that the Act be applied to the San Clemente property.[2] Thus, it does not alter the rights or obligation of any party involved in the San Clemente transactions.

---

[1]*See, Woodwork Manufacturers* v. *NLRB*, 386 U.S. 612, 639 n. 34 (1967); *Allyn* v. *United States,* 461 F.(2d) 810, 811 (Ct. Cl. 1972).

[2]Although some comments by Senator Stevens lend support to the argument that the Act itself should be applied to the Nixon property (*see* 125 CONG. REC. S. 11815 (daily ed., Sept. 5, 1979)), the debate taken as a whole illustrates that the Congress did not believe the Act could be applied retroactively but wanted formally to declare that the principles of the Act should be applied to all similarly situated property.

## II.

Your next question is whether the Government has a legal obligation to comply with Mr. Nixon's request that all Government items be removed and that his property be restored to its original condition. The Presidential Protection Assistance Act, § 5(b), provides that if the owner of the property requests the removal of the improvements or other items, such items shall be removed and the nongovernmental property shall be restored to its "original state." Because this Act is not retroactive, however, it is not necessary to interpret the language of this provision. The rights and obligations of both the United States and Mr. Nixon must be determined without the assistance of that Act.

The threshold question regards the present title to the property in question. The Constitution gives to Congress the power to make all needful rules and regulations respecting the property of the United States. Constitution of the United States, Article IV, section 3, clause 2. Whether title to property of the United States has passed is a question of Federal law. *Jourdan* v. *Barrett*, 45 U.S. (4 How.) 169, 184-85 (1846); *Wilcox* v. *Jackson*, 38 U.S. (13 Pet.) 498, 517 (1839). At the time these improvements were placed on the property, there was no act of Congress stating whether title would remain in the United States or pass to the landowner.[3] Because only Congress can authorize the disposal of Federal property, it must be determined whether congressional authorization to purchase the property and place it on nongovernmental property worked a transfer of title. Although the specific statutory authority for the expenditures is unclear,[4] the expenditures apparently were made pursuant to Pub. L. No. 90-331, § 2, 82 Stat. 170 (1968), repealed by the Presidential Protection Assistance Act. Section 2 provided:

> Hereafter, when requested by the Director of the United States Secret Service, Federal Departments and agencies, unless such authority is revoked by the President, shall assist the Secret Service in the performance of its protective duties under section 3056 of title 18 of the United States Code and the first section of this joint resolution.

The general common law rule holds that when a person voluntarily and gratuitously places improvements on property not his own, such improvements become the property of the landowner, in the absence of an agreement to the contrary. *See, Chicago Title & Trust Co.* v. *Fox Theatres Corp.*, 164 F. Supp. 665, 671 (D.C. N.Y. 1958). This rule, consistent with the rules on trespass and conversion, grew out of the notion that a person who meddles with the property of another assumes the risk of doing so.

---

[3] The Presidential Protection Assistance Act now provides that all improvements and other items acquired and used for the purpose of securing any nongovernmental property shall be the property of the United States.

[4] *See* H. Rept. 1052, *supra.*

*Restatement of Restitutions*, § 42(l), and *comment a* thereto. Here, however, there was no meddling or mistake as to ownership. All parties understood that the improvements were being constructed on Mr. Nixon's property. If not made at the request of Mr. Nixon, they were made with his knowledge and approval. The improvements benefited both Mr. Nixon and the United States, which had a duty to protect him. The improvements were used by the United States in carrying out Federal functions.[5]

The United States and a private party can agree that fixtures placed by the Government on the land of the private party do not automatically become the property of the landowner. In *United States* v. *Allegheny Co.*, 322 U.S. 174 (1944), a contractor installed Government-owned machinery in his mill pursuant to a contract with the United States. It was agreed that the equipment specially required for the work should remain the property of the United States although it could not be removed without damage to the contractor's building. Allegheny County, seeking to tax the equipment, denied that the Government had valid title to the machinery. The Court concluded that although the contractor had some legal and beneficial interest in the property as a bailee for mutual benefit, title to the property remained in the United States.[6] In *Crowell Land & Mineral Corp.* v. *United States*, 114 F. Supp. 31 (W.D. La. 1953), the United States installed a pipe under lands leased by it from plaintiff, and subsequently removed the pipe, allegedly after the time allowed by the lease. The plaintiff sued to recover the value of the pipe. Noting that forfeitures are not favored in the law, the court held that the pipe "undoubtedly was and remained the property of the United States," even if the period of time allowed by the contract had expired. Even in the absence of an express agreement, public policy may dictate that the party who constructed the improvements retain title.[7] We believe it was the tacit understanding of all parties here that title remained in the United States.[8] All Government-purchased property placed on the private property of prior "protectees" has been considered property of the Federal Government until

---

[5]We assume that all purchases were authorized by the Government. For the purpose of determining the ownership and disposition, there is no need to distinguish property necessary to legitimate Federal function and property that may not have been necessary.

[6]Insofar as *Allegheny County* held that a tax measure by the value of Government-owned property may never be imposed on a private party, it was overruled by *United States* v. *City of Detroit*, 355 U.S. 466, 495 (1958). *See*, *United States* v. *County of Fresno*, 429 U.S. 452, 462-63 n. 10 (1977). Those rulings did not affect the holding of *Allegheny County* as to title.

[7]In *Chicago Title & Trust Co.* v. *Fox Theatres Corp.*, 164 F. Supp. 665, 671 (S.D. N.Y. 1958), the court wrote:

Where, however, the buildings are erected by a lessee for trade purposes they have been held to be trade fixtures which, in the absence of provisions to the contrary in the lease, are the lessee's property and reasonable time thereafter. This rule is based upon a public policy long ago enunciated to encourage trade and manufacture.

[8]Transfer of title at the time of the improvements may conflict with Article II, section 1, clause 7 of the Constitution, which provides:

The President shall, at stated Times, receive for his Services, a compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

444

actual abandonment by the United States under the authority of 40 U.S.C. § 483(h). The Government remained in control of improvements in performing its obligations to the former President. Congressional authorization to expend the funds did not transfer title to Mr. Nixon. Thus, we believe that title remained in the United States.

The question also arises as to the disposition of such property upon Mr. Nixon's sale of the estate. There apparently is no issue as to the disposition of property not affixed to the estate. These items, according to the study you have provided to us, are easily removable and Mr. Nixon asks that they be removed. They should be removed when they are no longer needed at that location. The more difficult question involves removal of the improvements that are affixed to the land and buildings. Examples of these improvements are a blockwall and fence, a bullet-resistant glass screen, window alterations, a sewer line, a gatehouse, and guardhouses.

The Government is generally under a duty to return the premises to the owner in as good a condition as when the improvements were made. This conclusion is based on an implied covenant against waste. *United States* v. *Bostwick,* 94 U.S. 53, 66–68 (1876); *United States* v. *Jordan,* 186 F.(2d) 803, 806 (6th Cir. 1951), *aff'd,* 342 U.S. 911 (1952). "As good a condition" does not, however, require removal of all the improvements. It would benefit neither the Federal Government nor Mr. Nixon to engage in the costly removal of these items which have minimal salvage value. Having consented to this installation when it was apparent that subsequent removal would not be economically or structurally feasible, Mr. Nixon cannot, we believe, successfully enforce his demand that they be removed. If the property is placed in as good a condition as existed prior to the improvements, Mr. Nixon is not damaged by the failure of the United States to comply with his request for removal of the items. Although they remain Government property until abandoned, the Government is not obligated to remove them.

## III.

Your final question is whether the Government can require Mr. Nixon to reimburse the Government for the portion of the sale price attributable to the Government improvements. There is no clear answer to this question. Certainly Mr. Nixon cannot be required to reimburse the United States for these improvements so long as they are used to further a public purpose, that is, the protection of the former President. If the former President decides to sell the property and thus terminates the need for the protection at that site, however, it can be argued that he is obligated to remit to the United States the portion of the total proceeds attributable to the sale of the Government's property. This conclusion follows from the fact that title to the property remains in the Government and that retention of the proceeds by Mr. Nixon would result in his unjust enrichment.

The general rule is that persons who cause improvements to be made on the land of another are not entitled to restitution. *Restatement of Restitutions* § 42(1) (1937). Where the improvements are made with the knowledge and approval of the landowner and are necessary for his protection, however, the person who pays for the improvements is entitled to restitution. *Cf. Restatement of Restitutions*, § 112 (1937). A person who in good faith improves the property or another may require payment for the improvements placed upon the property or for the increased value of the land. *See, Crowell Land & Mineral Corp.* v. *United States*, 114 F. Supp. 31, 36 (W.D. La. 1953). If Mr. Nixon refuses to transfer the funds from the sale of Government property, the Government may have a cause of action in quasi-contract, seeking restitution for the sale of its property. Another basis of recovery would be an action for money had and received, which is predicated on the theory that the defendant has received money which in fact belongs to plaintiff, and in which the defendant never at any time had an ownership interest. *United States* v. *Elliot*, 205 F. Supp. 581, 585 (N.D. Cal. 1962). This action is equitable in nature, premised on the assertion that money is held by the defendant which in equity and good conscience should be delivered to plaintiff.[9] A government has the same rights to restitution as do private individuals or corporations, and the same procedural rules apply.[10] A government can seek restitution of public assistance payments fraudulently obtained,[11] money paid by mistake,[12] and kickbacks illegally paid to Government employees.[13] It also has been held that moneys collected under color of office without any legal authority are to be paid to the public authority on whose behalf they were illegally collected.[14]

---

[9]*See, Bloomfield Steamship Co.* v. *United States*, 258 F. Supp. 891, 910 (S.D. Tex. 1964), *rev'd*, 359 F.(2d) 506 (5th Cir.1966) cert. denied, 385 U.S. 1004 (1966). An analogy here can be drawn to the law of partition in which a cotenant who has made permanent and valuable improvements on the property is entitled to recover the amount by which the improvements enhanced the sale value of the property. *See, Hunter* v. *Schultz*, 240 C.A. 2d 24, 31, 49 Cal. Rptr. 315 (1966); *Buttram* v. *Finley*, 73 Cal. App. 2d 536, 166 P.2d 654, 658 (1946); *Carson* v. *Broady*, 56 Neb. 648, 77 N.W. 80 (1898).

[10]*See, United States* v. *Carter*, 217 U.S. 286 (1910; *Sanborn* v. *United States*, 135 U.S. 271, 281 (1890)). In *United States* v. *R.J. Reynolds Tobacco Co.*, 416 F. Supp. 316, 325 n. 3 (D.N.J. 1976), the United States sought a declaratory judgment as to the legal relations of parties to a merger. The court emphasized that the United States stands before a court on an equal basis with private parties and is bound by the same general rules.

[11]*See, People* v. *Flores*, 17 Cal. Rptr. 382 (1961); *County of Champaign* v. *Hanks*, 41 Ill. App. 3d 679, 353 N.E. 2d 405 (1976).

[12]*Sanborn* v. *United States*, 135 U.S. 271, 281 (1890); *In re Griven's Estate*, 166 Kan. 630, 203 P.2d 207, 209-10 (1949).

[13]41 U.S.C. §§ 51-54. *United States* v. *Drumm*, 329 F. (2d) 109, 113 (1st Cir. 1964); *Continental Management, Inc.* v. *United States*, 527 F.(2d) 613, 620-21 (Ct. Cl. 1975).

[14]*Webster Co.* v. *R. T. Nance*, 362 S.W. 2d 723 (Ky. App. 1962). In *Webster Co.*, the court required a justice of the peace to pay to the county all traffic fees the justice illegally collected. The court reasoned that no officer is entitled to receive for the performance of his duties more than is authorized by the law. *Id.* at 724.

This is a unique situation, and it is difficult to predict whether a court would adopt the equitable arguments set forth above. To determine the rights of a former President in this situation, a court undoubtedly would give great weight to past practices.[15] In your letter you state:

> In past instances where Government services to a former president or vice president were being terminated at a privately owned location (including Mr. Nixon's Key Biscayne estate), all Government property that could be reasonably and economically removed was removed and only these items or improvements having a salvage value of far less than the cost of their removal were left on the property. In these instances it has been the practice of the General Services Administration to enter into a written agreement with the property owner wherein the owner agrees to allow the Government to abandon those items and/or improvements which could not be removed economically in exchange for whatever enhancement his property has gained by the addition of these Government items or improvements.

A court reasonably might examine these prior agreements and conclude that they define the rights of the parties here. In that case, the United States would not be entitled to reimbursement.[16]

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[15]*See generally, United States* v. *Midwest Oil Co.,* 236 U.S. 459, 474 (1918). In 1974, the Attorney General relied on historical practice to conclude that a President retains ownership of Presidential documents. 43 Op. Att'y. Gen. 1 (Sept. 6, 1974). In *Nixon* v. *Administrator,* 433 U.S. 425, 445 n. 8 (1977), the Court refused to reach this question. As with Government improvements to private property, Congress recently has enacted legislation specifying that the United States shall retain ownership. *See* Presidential Records Act of 1978, Pub. L. No. 95-591, § 2(a), 92 Stat. 2523 (codified in 44 U.S.C. § 2202).

[16]Past practice appears to reflect the proposition that refusal to remove property in such circumstances should be regarded as a constructive abandonment notwithstanding the subjective intent of the party refusing to remove. Such an argument is not without force. Acts indicating a desire neither to use nor to retake possession of property are inconsistent with an intent to retain ownership. *See, e.g., Ellis* v. *Brown,* 177 F. (2d) 677, 679 (6th Cir. 1949); *Gilberton Contracting Co.* v. *Hook,* 255 F. Supp. 687, 693-94 (E.D. Pa. 1966).