A. J. DALTON et al., Appellants,

v.

Allen L. MULLINS, Appellee.

Court of Appeals of Kentucky.

May 18, 1956.

E. D. Stephenson, Sanders & Hyden, Dan Jack Combs, Pikeville, for appellants.

Francis M. Burke, F. Dale Burke, Pikeville, for appellee.

MOREMEN, Judge.

The appellants, A. J. Dalton, Dalton Coal Sales, Inc., and Mountain States Coal Corporation prosecute this appeal from a judgment of the Pike Circuit Court by which the appellee, A. L. Mullins was awarded $21,995.84.

The action was commenced by A. J. Dalton (March 4, 1950) seeking recovery of a money judgment for breach of contract.

The contract, which is the subject of the litigation, was entered into by Dalton and Mullins on April 3, 1946, and, among other things, contained three provisions of basic importance: (1) Dalton subleased to Mullins a 38 acre tract of coal at a royalty charge of 15¢ per ton; (2) Mullins constituted Dalton exclusive sales agent at a commission of 10¢ per ton for coal mined not only from the 38 acre tract but also for any coal mined by Mullins on the water shed of Bowling Fork of Marrowbone Creek; and (3) Mullins promised to pay

Dalton 30¢ per ton for dockage for the use of Dalton's loading ramp over which the coal was to be loaded. Bimonthly settlements were to be made with Dalton deducting the above charges—55¢ per ton.

Dalton in his petition alleged that Mullins was not abiding by the contract in that he was loading coal over ramps other than the appellants' and selling his coal through other sales agents.

On March 20, 1950, Mullins filed answer and counterclaim and made it a cross-petition against the corporate appellants. Through this pleading Mullins also relied upon the 1946 contract and alleged that inasmuch as the named corporate defendants, owned and operated by Dalton, assumed the obligations and received the benefits of the original contract entered into with Dalton they should be equally bound. Mullins alleged that the defendants wrongfully withheld from him information concerning the true sale price of coal and paid him through the bimonthly checks far less than that price. Mullins sought an accounting and prayed for recovery of $89,440.35.

A reply traversing the answer completed the issues and the case was, in January 1952, referred to the master commissioner for hearings.

In January 1953, Dalton filed an amended reply and tendered an amended petition. In the reply Dalton alleged the parol cancellation of the 1946 contract and averred that Mullins was estopped to assert its validity. In the amended petition Dalton sought to dismiss the allegation of prior pleading in which he sought damages for loss of sales commission and dockage. The corporate appellants filed, at the same time, an amended answer in which allegations similar to those made in Dalton's reply were made.

Finally, in December 1953, Dalton and the corporate appellants tendered and offered to file additional pleadings which in substance take the following views:

(1) That the parties had abandoned the original agreement;

(2) That Mullins by accepting semimonthly statements accompanying his checks in payment for coal delivered *had sold his coal to the Dalton interest;*

(3) That, in the alternative, should the contract be upheld, Dalton should recover not only dockage and sales commission for coal delivered prior to January 15, 1950, but also the same charges for all coal mined by Mullins after that date.

From the evidence, all of which was heard by a commissioner, it appears that in 1946—the year the contract in issue was made—Dalton was extensively engaged, among other things, in buying and selling coal, operating coal ramps, and consigning and selling coal produced by others. Prior to September 1946, this business was conducted under the name of A. J. Dalton—Low Ash Mines. In September 1946, Dalton organized three corporations—Dalton Mines, Inc., Dalton Coal Sales, Inc., and Dalton Stores—for the purpose of operating his properties and all of his businesses. In September 1948, these three corporations were consolidated and the name changed to Mountain States Coal Corporation, and Dalton, as president and sole owner, continued to operate his coal business through this corporation until the time of this suit.

In June 1946, Mullins commenced production of coal and delivered the coal to the Dalton ramp through the Low Ash Mine until September 1946; through Dalton Coal Sales, Inc. until September 1948; and through Mountain States Coal Corporation until this controversy arose.

Dalton admitted the organization of these corporations and the assumption by them of his business operations.

Dalton, in his testimony, admitted the execution of the contract and sales agency agreement, but disavowed the contract, and asserted that the coal was purchased by him not as a sales agent but as an outright sale from Mullins to himself, Dalton. Dalton testified that the parties had agreed to eliminate the sales agency agreement but could not produce a written agreement substantiating his testimony.

There were introduced in evidence by a Mrs. Carter, Dalton's secretary, copies of letters of transmittal accompanying checks by which Dalton paid Mullins for coal in semimonthly settlements. These letters have on them the words, "purchased coal"— or for coal "sold by you." Mrs. Carter asserted that appellee had never made any complaint that he was not being paid pursuant to the contract and she admitted that the sales agency portion of the agreement was never carried out.

Another exhibit introduced by Mrs. Carter was a summary of all the tonnage shipped by Dalton during the period of April 1946, until January 1950, and a statement showing the total tonnage of all coal mined and sold from June 1946 to January 1950, and the average price received per ton by the month. Another exhibit filed by Mrs. Carter was a statement showing the amount of coal delivered by Mullins in the same period (June 1946—January 1950) to be 61,638.20 tons.

Neither Mr. Dalton nor his secretary, Mrs. Carter, was able to produce the actual prices for which the coal delivered by Allen Mullins was sold.

On rebuttal, one of Dalton's employees who worked at the coal ramp to which Mullins supposedly delivered all of his coal, testified that on different occasions during the latter part of 1949 and the early part of 1950, Mullins drove past the Dalton ramp and apparently disposed of his coal to other buyers.

Mullins testified that from the time the contract was executed on April 3, 1946, and after production of coal commenced, he delivered all the coal produced by him from the leasehold and other mines operated by him on Sycamore Fork to the Dalton ramp. He testified that he had never agreed to any change in the contract and had always understood, until about January 1950, that he was getting the sale price of the coal less the authorized reduction. Mullins further stated that when he obtained information that Dalton was not paying him the full price for coal delivered, he approached Dalton about the matter and that when Dalton refused to comply with the contract, he commenced selling his coal to other parties at the best price possible. Mullins testified that he knew nothing about appellant's bookkeeping and had assumed and relied upon Dalton's honesty in conforming to the contract. He admitted he received letters of transmittal and that he deposited in the bank bimonthly checks issued by the Dalton interests. (Some reliance is placed on the fact that Mullins, having only attended school to the third grade, did not understand the bookkeeping procedures and the data included in the letters of transmittal.)

Mullins introduced as an exhibit an unsigned contract, which contract was given to him by Dalton on March 13, 1950, (after this suit was filed). This contract was designed to cancel the previous contract of 1946.

In its findings of fact, the lower court reached the judgment figure of $21,955.84 in the following manner: From the exhibits filed by Mrs. Carter, Dalton's secretary, it was determined that between the dates of June 16, 1946, and January 15, 1950, Mullins delivered to the Dalton ramp 61,638.20 tons of coal and received in semimonthly payments from Dalton the sum of $272,533.14.

From the exhibit showing the "average price" (by month) received by Dalton for coal, it was determined that for the 61,638.20 tons of coal delivered by Mullins, Dalton received $321,832.92.

From this amount there was deducted $32,400.61—representing the 55¢ per ton for royalty, dockage and sales commission, to which Dalton was entitled. This left $289,432.31, the sum Mullins should have received for his coal.

The lower court subtracted from the sum Mullins should have been paid ($289,432.31) the sum Dalton in fact paid in semimonthly checks for the coal ($272,533.14) and arrived at the figure of $16,899.17 Dalton should have paid Mullins under their contract and adjudged interest on each semimonthly payment from the time same was due and payable.

It was determined also that Mullins, during the last half of December 1949, and at some time prior to January 15, 1950, delivered to ramps other than Dalton's, coal amounting to the tonnage of 831.53. For this Dalton was allowed a credit (or set-off) of $452.33, representing 30¢ per ton dockage and 10¢ per ton sales commission (the royalty already having been paid) against the total amount due Mullins.

For some of the semimonthly periods involved, it appeared that Mullins was paid more than he was entitled to and for other periods less than he was entitled to. From a calculation filed with the judgment, it was determined that Dalton was entitled to $860.55 interest for overpayments and that Mullins, for underpayments, was entitled to interest in the sum of $6,519.25, leaving net interest in favor of Mullins in the sum of $5,658.70. From the lower court's judgment allowing Mullins the sum of $21,995.84, this appeal is prosecuted.

This case by agreed order was practiced under the Civil Code of Practice in effect prior to July 1953.

■ At the outset it must be remembered that where, as here, the facts were submitted to a court without the intervention of a jury, its findings thereon were entitled to the same weight as the verdict of a properly instructed jury and they would not be disturbed unless they were flagrantly against the evidence. Adkins v. Meade, Ky., 246 S.W. 2d 980, and cases therein cited.

With this in mind, we now turn to the points urged by the appellants for reversal:

■ (1) Appellants first argue that the sales agreement had been abandoned by mutual consent of the parties. While it is true, as appellants assert, a written contract can be modified or abandoned by a subsequent oral agreement, the proof to support such an assertion must be clear and convincing. Dehlinger v. Graue, 238 Ky. 461, 38 S.W.2d 246, and cases therein cited. As above set out, the evidence on an alleged abandonment was in conflict and we believe the trial court in choosing to look to

the writing was well within its province. The proof of cancellation was far from convincing. Moreover, Dalton, in his original pleading, relied upon the validity of the contract as a whole and even though this pleading was ultimately abandoned in subsequent pleadings, it served as competent evidence to refute the appellants' claim of abandonment. Streipe v. Liberty Mutual Life Insurance Co., 243 Ky. 15, 47 S.W.2d 1004.

■■ (2) Appellants insist that appellee Mullins, by accepting over a three-year period the letters of transmittal (on which appeared the words "purchased coal" or "coal sold") acquiesced in the abandonment of the sales agreement and was estopped to assert otherwise. In view of the fact that the contract constituted Dalton not only the exclusive sales agent for all coal mined and delivered by the appellee, but also required Dalton to keep records and to render bimonthly settlements, the appellee was entitled to assume and had the right to rely upon Dalton's good faith performance of the contract. In accepting the letters of transmittal from Dalton, his agent, Mullins was not required to so closely scrutinize each and every statement, as appellants assert, but was entitled to rely to some degree on Dalton's good faith in rendering correct statements. In short, we believe, as the trial court did, that Mullins did not acquiesce in Dalton's abandonment of the very essence of the contract. For the same reason estoppel does not apply against Mullins. Even were we to accept the averment that Mullins acquiesced in the appellants' misconduct, we fail to find where they (appellants) suffered a legal detriment, a prerequisite to the operation of the doctrine of estoppel. Simmerman v. Fort Hartford Coal Co., 310 Ky. 572, 221 S.W.2d 442, 11 A.L.R.2d 381.

■ (3) Equally unavailing is the argument that, by the appellee's endorsement of the bimonthly voucher checks, written memoranda were created against which Mullins could not orally testify. See Hammon v. Kentucky Central Life & Acc. Ins. Co., Ky., 289 S.W.2d 726.

The rule which appellants invoke might attach had each bimonthly account for which checks were delivered been in dispute. That, however, was not the case, as the trial court apparently found, for Mullins clearly did not find out that there was any question about the amounts which he was being paid for coal until he had accepted the bimonthly checks for over a period of nearly three years.

(4) The appellants next argue that Mullins failed to show he performed the duties imposed upon him by the contract and was therefore barred from recovery thereunder. This argument fails to take into consideration that the party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform. Am.Jur., Vol. 12 Contracts, § 338. Dalton himself testified that he did not abide by the sales portion of the contract from its inception and he cannot, therefore, complain of any nonperformance by Mullins occurring subsequent to that date.

The situation is not, as contended by appellants, that Mullins sought a rescission of the contract. The trial court rejected this argument and in its rejection we concur. When Dalton refused to perform the contract as written, Mullins had the right to treat this action as a breach, to abandon the contract, and to depart from further performance on his own part and finally demand damages. Am.Jur., Vol. 12 Contracts, § 389. Anvil Mining Co. v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814. This then is not a rescission but is a mere acceptance of a situation brought about by the wrongdoing of a party. Moreover the trial court permitted, insofar as Dalton was able to prove that Mullins delivered coal from the leasehold to other ramps, a set-off (representing the 10¢ sales commission and 30¢ dockage per ton) against the amount ultimately adjudged to be due Mullins. Had Dalton desired he could have produced the record of royalties paid by Mullins prior to December 1949, which in turn would have reflected any discrepancy between the number of tons of coal mined and the number of tons of coal delivered. This he failed to do and we believe the evidence on this point more than supports the chancellor's findings.

(5) For the reasons announced above the appellants cannot recover under the contract on coal mined by Mullins from the leasehold subsequent to January 15, 1950. There was introduced by the appellants a record of royalties paid by Mullins to Dalton subsequent to December 1949 and extending through November 1952. It is the sales commission and dockage on this coal to which appellants assert they are entitled in the alternative should the contract be enforced. The trial court rightly found that Dalton breached the contract by refusing to comply with the sales commission agreement, and that Mullins had the right to refuse further deliveries and seek the best market available. Puckett v. Hatcher, 307 Ky. 160, 209 S.W.2d 742. As previously stated, he who first breaches a contract must bear the liability for its nonperformance. Thus no benefits should be obtained by the party who is guilty of the first breach. The action of Mullins in electing to abandon the contract after Dalton's breach had the effect of terminating the contractual relationship, save for a judicial determination of damages.

(6) The contention next made is that the contract not having any definite time for performance is terminable at will, and reliance is placed on Duff v. P. T. Allen Lumber Co., 310 Ky. 439, 220 S.W.2d 981. The contract in that case, as explained in Stephens v. Horn, 314 Ky. 752, 236 S.W. 2d 953, was one for personal services, ordinarily terminable at will, and was distinguished from that type of contract that calls for the performance of a definite amount of work and where no time is set for performance of the latter type, the law allows a reasonable time for its performance.

We believe the facts of this case place it within the rule announced in the Stephens case inasmuch as Mullins had the express right under the coal lease to

remove all the coal from the 38 acre leasehold, the only provisio being that the coal be dumped over appellants' ramp. The evidence shows that Mullins almost immediately entered upon the leased premises and commenced the production of coal and had, under the contract as we construe it, a reasonable time to remove all the coal from the leasehold. We are unable to fully comprehend appellants' point in this line of argument. To say the least, they cannot, after accepting benefits under the contract for a period in excess of three years, now be heard to say that they exercised the right, even were one present, to revoke the contract as one terminable at will.

(7) Appellants contend that the trial court erred when it imposed on the corporate appellants joint and several liability with Dalton. They would have us believe that the trial court held the corporate appellants responsible because, under the evidence, Dalton was proved to be, for all practical purposes, their sole owner. The evidence, as above summarized, fully establishes a privity from Dalton to Dalton Coal Sales Inc. and, in turn, to Mountain State Coal Corporation, and moreover they admit in their own pleadings that they accepted benefits and performed duties pursuant to the contract. The documentary evidence more than substantiates this fact and in doing so concretely establishes their liability thereunder.

(8) The next contention made by appellants is that Ernest Mullins, a brother of appellee Allen Mullins, was a partner of Allen in this coal-mining venture and hence was a necessary party. While we doubt that the evidence supports this assertion, the appellants will not be heard to raise an objection to the parties for the first time in this court. See Civil Code of Practice, § 90 and § 118. Ward v. Blair, 231 Ky. 96, 21 S.W.2d 123.

(9) (10) The argument next advanced is that the claim sued on was unliquidated and, being so, interest should have been allowed only from the date of judgment. We are not so much disturbed as to whether the claim is liquidated or unliquidated as we are, in accordance with the popular trend, as to whether justice and equity demand an allowance of interest to the injured party. It is with this in mind that there has been promulgated the rule that even on unliquidated claims allowance of interest is discretionary with the court. See Magruder v. Ericson, 146 Ky. 89, 141 S.W. 1195. Where under a contract a debt is due at a certain time, both reason and authority say that it carries interest from that time. Henderson Cotton Mfg. Co. v. Lowell Machine Shops, 86 Ky. 668, 7 S.W. 142. The contract here providing for bimonthly payments in money falls within the above rule. This being so, a discussion of the question of whether the claim is liquidated or unliquidated is rendered unnecessary.

The criterion for the allowance of interest is aptly expressed in the case of Laycock v. Parker, 103 Wis. 161, 79 N.W. 327, 335:

"The true principle, which is based on the sense of justice in the business community and on our statute, is that he who retains money which he ought to pay another should be charged interest upon it. The difficulty is that it cannot well be said one ought to pay money, unless he can ascertain how much he ought to pay with reasonable exactness. Mere difference of opinion as to amount is, however, no more a reason to excuse him from interest than difference of opinion, whether he legally ought to pay at all, which has never been held an excuse."

See Corbin on Contracts, Vol. 5, § 1046, page 237.

(11) The appellants' final argument in effect is that the judgment is not supported by the pleadings. They point out that the appellee in his counterclaim and cross-petition claimed recovery on 59,626.90 tons of coal whereas the number of tons figured in the final accounting and judgment amounted to 61,638.20 tons of coal.

While the appellee's pleadings did state the number of tons allegedly believed to

have been delivered to the appellants, the counterclaim and cross-petition not only made the contract a part of the pleadings and asked for a money judgment of $89,-440.35, but also asked for a general accounting. It was from the appellants' evidence that it was established that the appellee had in fact delivered 61,638.20 tons of coal to appellants' ramp. The chancellor was justified in accepting the figures as deduced from appellants' own evidence, and appellee's pleadings, when viewed as a whole in connection with the contract, fully support the judgment.

The case of Williamson v. Romans, Ky., 258 S.W.2d 455 relied upon by appellants in support of this contention involved the title to a specific tract of land and is therefore not in point.

Wherefore the judgment is affirmed.