798 F.2d 1416
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Hargus SEXTON, Individually, and Hargus Sexton General
Agency, Inc., Plaintiffs-Appellees,
v.
INTEGON INDEMNITY CORPORATION, Defendant-Appellant.
 No. 85-5546.
 United States Court of Appeals, Sixth Circuit.
 July 11, 1986.
 
 Before MARTIN, KRUPANSKY and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Pursuant to the terms of an agency agreement, dated June 19, 1974, plaintiff Sexton became the general agent in the State of Kentucky for defendant Integon for the sale of farm insurance and crop-hail insurance. Farm insurance is essentially casualty insurance on farm buildings, property, and machinery. Crop-hail insurance, as the name implies, specifically covers crop loss and damages inflicted by hail.
 
 
 2
 Farm insurance is relatively high-risk coverage and crop hail insurance is relatively low-risk coverage. Because of this, farm insurance is written and sold on a three-year basis with the premiums being paid in three annual installments. Integon had the responsibility for record keeping on the farm insurance. Crop-hail insurance was written on a one-year basis and was written generally on credit with premiums being paid when the crop was sold. If a loss occurred under a policy on which the premium was unpaid, th e premium would be deducted from the loss paid. Additionally, the crop-hail insurance involved a pool agreement between Integon and the Reliance Insurance Companies, with each sharing losses, profits, and expenses on a 50-50 basis. It was the responsibility of Sexton to keep the books and records on crop-hail insurance. Crop-hail funds were to be kept in a separate bank account and Sexton had the responsibility to for ward to the pool companies a year-end audit. It is undisputed that the audit was done informally and usually consisted of someone from Integon coming out to Sexton's offices and looking through the books and records.
 
 
 3
 Throughout 1976 and 1977, Integon experienced losses on the farm insurance policies which it found unacceptable and, in October of 1977, Integon informed Sexton that its agency agree ment was terminated as of December 31, 1977. As a result of this termination, Sexton started suit in the Fayette Circuit Court against Integon in March of 1978. Integon removed to federal court on diversity grounds and filed an answer and counter-claim.
 
 
 4
 Sexton essentially sought to recover for sums allegedly owed for unpaid commissions, sums expended which were allegedly the responsibility of Integon to pay, and damage to business reputation. The counter-claim of Integon essentially sought to recover sums owed pursuant to the annual accounting of the crop-hail insurance accounts. There is no dispute that the year-end 1977 audit showed monies owing from Sexton to the pgol companies on the hail insurance accounts. Sexton paid Reliance its half, but because of the lawsuit he had with Integon, Sexton refused to remit any monies .to Integon, holding them as a set-off against alleged damages and, instead, purchased a $300,000.00 certificate of deposit with the disputed funds which had been held in the trust account.[1]
 
 
 5
 A bench trial was held on March 12, 1984, and although the trial involved a number of complicated issues, we are not called upon to review all of them. In general, the trial court denied, for the most part, the relief requested by Sexton in his complaint and granted judgment to defendant on its counter-claim. Findings of fact and conclusions of law as well as amended fin dings of fact and conclusions of law were filed by the trial judge.
 
 
 6
 Although substantially prevailing below, Integon has appealed a portion of the trial court's judgment. Sexton has not cross-appealed the denial of his claims. Considering the multiplicity of issues raised at trial, the appeal issues are relatively narrow. The judgment finally entered by the court on January 31, 1985, along with the amended findings of fact and conclusions of law disallowed all but post-judgment interest on the sums due defendant on its counterclaim. Defendant challenges this holding on appeal. Defendant also claims error as a result of a credit given Sexton of $16,200 for claims paid. This claim had been denied by the trial court originally but was allowed in the amended findings of fact and conclusions of law.[2] We con sider both of these claimed errors but in the reverse order above enumerated.
 
 The Disputed $16,200 for Claims Paid
 
 7
 The end of the year settlement between Sexton and the pool companies did not establish a reserve for claims made but unpaid. Rather, the procedure was for the pool companies to reimburse Sexton for any claims pending at the end of the year which Sexton subsequently paid. However, in 1978, due to the dispute between the parties, Sexton put all the trust account monies in a Certificate of Deposit and then paid any subsequent claims from his own pocket. It is undisputed that at the end of 1977 there were claims made which were unpaid. Sexton claimed to have paid these claims and if he did there is no doubt that he was entitled to set these sums off against any money owed to Integon on its counter-claim.
 
 
 8
 In its initial August 1, 1984 Findings of Fact, the trial court determined that Sexton had failed to carry its burden of proof as to whether these claims were actually paid, stating that the trial evidence on this issue was "vague and insubstantial." Sexton subsequently filed a Motion to Reopen the Evidence. The only new evidence the trial court allowed in was a March 23, 1978 statement of a settlement of 1977 crop-hail accounts between Reliance and Sexton. Since Reliance and Integon were 50-50 partners in the pool, any settlement statement between Sexton and Reliance would be equally applicable to Integon if accurate.[3] This statement shows a $32,400 reserve for open claims which Reliance accepted as accurate. Each pool partner's half of this $32,400 would, of course, be $16,200.
 
 
 9
 After receipt of this evidence, the trial judge amended his findings of fact which had previously disallowed this set-off to Sexton and stated:
 
 
 10
 9. Pursuant to the statement of March 23, 1978, the reserve for open claims was $32,400. Sexton paid out the entire reserve in settlement of loss claims.
 
 
 11
 (App. 142)
 
 
 12
 As a predicate for this ultimate finding of fact, the court also stated:
 
 
 13
 9. Sexton objects to the Court's finding that he failed to carry his burden of proof in showing that the reserve for loss claims (shown to be $27,400 on the February statement and $32,400 on the March statement) had in fact been paid out in settlement of loss claims. The Court's finding was based on the fact that Sexton produced no books, records, or cancelled checks to evidence payment of said reserves.
 
 
 14
 Sexton admits that he had no documentation to support his testimony because all the pertinent records had been sent to Integon, which apparently has subsequently destroyed said records and files. Therefore, no tangible proof presently exists concerning the pay-out of the reserve for loss claims.
 
 
 15
 Due to the fact that Integon had made no claim or allegation that these reserves were not rightfully paid, and that Integon has failed to come forward with tangible evidence contrary to the testimony that said reserves had been paid out in claims, the Court is now of the opinion that Sexton's testimony regarding same should be accepted as fact.
 
 
 16
 (App. 141-142.) Both, Sexton and his bookkeeper testified at trial that these claims had been paid out of Sexton's pocket.
 
 
 17
 On appeal, trial court findings of fact are reviewed under a "clearly erroneous" standard. Anderson v. Bessemer, 105 S. Ct. 1504, 1512 (1985); Fed. Rules Civ. Pro. 52(a). Here, plaintiff alleged he sent his pertinent records to Integon and therefore no longer had documentation to show each claim paid.[4] This, coupled with the fact that there was testimony from Sexton and his bookkeeper that these claims were in fact paid, was a sufficient basis for the trial judge to conclude as he did. The March 23, 1978 report accepted by Reliance also adds substance to the reliability of the amount involved. Credibility determinations are for the trial judge. We are unable to find that Judge Reed was "clearly erroneous" in this factual determination and on this issue we affirm.
 
 The Pre-Judgment Interest Issue
 
 18
 The initial findings and conclusions of the trial court awarded interest to defendant on the sums owed on its counter claim. In its amended finding and conclusions, however, the court denied interest on the grounds that the counter-claim was unliquidated and that no pre-judgment interest is awardable on an unliquidated claim.
 
 
 19
 On appeal, Sexton argues that the claim of Integon was in fact unliquidated and thus there was no abuse of discretion by the trial court in denying pre-judgment interest. Integon, on the other hand, although arguing its claim was liquidated does not urge this as its primary grounds for reversal. Rather, Integon argues that Sexton, as to these funds, had a fiduciary relationship with Integon and where he was in possession of the fund which drew interest he should not be allowed to keep this interest which would amount to a windfall.
 
 
 20
 Although not necessarily adopting defendant's legal conclusions as to the relationship between the parties, we do agree with defendant that this issue does not turn on whether this was a liquidated or unliquidated claim. The monies involved here were segregated in a separate trust account. Sexton never denied that the 1977 year end accounting would result in monies being owed to Integon. When Sexton elected to take these trust monies and invest them in a Certificate of Deposit, he did so largely to protect himself relative to the claims he was making against Integon for damages. These claims, however, were disallowed and Sexton is in the position of having in his possession a certificate of deposit purchased for $300,000 which at the time of trial was worth $482,127.39. Since the trial court found that Sexton was indebted to Integon in the amount of $167,498.45, the interest earned on that amount of the initial $300,000 was earned on monies belonging to Integon. To allow Sexton to now keep this interest would result in an unjust enrichment. That Kentucky ' courts recognize this doctrine is illustrated by the analogous cases of Curtis v. Campbell, 336 S.W.2d 355 (Ky. 1960), and Dalton v. Mullins, 293 S.W.2d 470 (Ky. 1956).
 
 
 21
 We are not dealing here with a situation in which a person is being required to pay interest on an unliquidated claim. Rather, this is a situation where Sexton created a fund out of monies which at least partially belonged to Integon. Integon is entitled to the interest earned on that part of the fund that rightfully belonged to it.
 
 
 22
 Although Integon advances several theories as to the rate at which it should be paid interest, we conclude that under the circumstances presented here, where there was an actual fund in existence earning interest, that Integon will be equitably made whole by being paid the interest actually earned on that portion of the Certificate of Deposit which was rightfully its funds.[5]
 
 
 23
 The judgment of the district court is REVERSED on the issue of pre-judgment interest, and this matter is REMANDED to the district court for the computation and award of interest consistent with this opinion.
 
 
 
 [1]
 The trust account contained approximately $299,000 and Sexton added $1,000 of his own money to make the Certificate of Deposit an even $300,000. It appears that this Certificate of Deposit is still uncashed pending the resolution of this dispute
 
 
 [2]
 In general, the procedure for the handling of the crop-hail monies was that Sexton would keep all money collected and pay all claims. If monies collected were insufficient to pay all claims, Sexton would notify the pool companies who would forward the additional funds needed. At the end of the year, the parties would settle with each other pursuant to the terms of the agency contract
 
 
 [3]
 Integon concedes this in its brief at page 9, and also states at page 11: "Although unorthodox, Integon feels the ends of justice were served by using the March 23, 1978 statement."
 
 
 [4]
 Integon admits that some records pertinent to this litigation were destroyed as part of its routine purging of old records
 
 
 [5]
 The court can conceive of cases where merely awarding the interest generated by the fund may not be equitable. However, here we conclude the funds were invested in a commercially reasonable manner