RENDERED: MARCH 26, 2020
TO BE PUBLISHED



# Supreme Court of Kentucky

## 2017-SC-000600-DG

PAUL MOSTERT  APPELLANT

|  |  |
|---|---|
| V. | ON REVIEW FROM COURT OF APPEALS<br>CASE NO. 2016-CA-001081-MR<br>FAYETTE CIRCUIT COURT NOS. 06-CI-02927 AND 08-CI-06239 |

THE MOSTERT GROUP, LLC  APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**AFFIRMING**

Appellant Paul Mostert developed computer technology aimed at predicting a thoroughbred's success by analyzing its biomechanics. In 2003, Mostert agreed to transfer the technology to a newly-formed business, The Mostert Group, LLC (TMG), in exchange for TMG stock, cash and a promissory note payable in installments. Mostert subsequently refused to deliver to TMG the source code, a component essential to maintaining and updating the software technology, so TMG declined to make the final promissory note payment to Mostert due on January 1, 2009. In the interim, TMG filed two lawsuits against Mostert in Fayette Circuit Court and, after years of litigation, appealed from an order granting partial summary judgment in favor of Mostert. Based on its construction of the documents executed by the parties in 2003,

the Court of Appeals reversed and remanded to the trial court. The appellate court concluded that the while the security agreement executed to secure payment of the promissory note gave Mostert the right to maintain possession of certain collateral, that right did not extend to the source code and Mostert's refusal to turn it over was a breach of his contract with TMG. Having granted Mostert's ensuing motion for discretionary review, we affirm the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

Dr. Paul Mostert created computer software and technology, known as EquiTrax, designed to predict a thoroughbred's success by analyzing its biomechanics. In 2003, he and two others established TMG, a business aimed at helping thoroughbred owners make investment, racing, and breeding decisions using the technology. On October 31, 2003, Mostert entered into a Contribution Agreement with TMG wherein he agreed to transfer the EquiTrax technology[1] and other assets in exchange for 200 shares in TMG, $64,000 for outstanding expenses and a $500,000 promissory note (Note) to be paid in installments. To secure the Note, TMG executed a Security Agreement giving Mostert a security interest in certain collateral, which consisted of software, patents, trademarks and the like.

---

[1] The parties' agreements pertain to various computer programs and technology, but the parties agree that the EquiTrax technology is the primary program at issue.

2

Despite these documents, Mostert and TMG disagreed as to which property constituted the collateral under the Security Agreement and the relationship between the parties deteriorated. More specifically, TMG claimed entitlement to immediate possession of the source code under the Contribution Agreement while Mostert claimed that he had a security interest in the source code which the Security Agreement allowed him to perfect by possession.

In 2006, TMG sued Mostert in Fayette Circuit Court for breach of contract, conversion, and misappropriating trade secrets, accusing Mostert of helping other individuals set up a competing horse biometrics venture. In response, Mostert filed an answer asserting that TMG defaulted on the Security Agreement and demanded that TMG turn over all collateral to Mostert. Because Mostert had retained possession of the source code, which was critical to maintaining and updating the EquiTrax technology, TMG asked the circuit court to compel Mostert to immediately provide the source code to TMG. The court denied both requests but instructed Mostert to preserve the source code pending further court orders.

From the date of the execution of the Contribution Agreement through early 2016, TMG requested to no avail, both directly and through the underlying litigation, that Mostert deliver the source code. In 2008, TMG filed a separate declaratory judgment action against Mostert seeking an order declaring that Mostert breached the Contribution Agreement by failing to deliver the source code and that TMG was entitled to withhold payments under the Note. The two cases were consolidated in October 2009 and that

3

consolidated action proceeded for several years with little activity, the issue of TMG's right to the source code unresolved.

In April 2014, TMG filed a motion for partial summary judgment on its claim that Mostert was in breach of the Contribution Agreement. Mostert responded that the perfection-by-possession clause in the Security Agreement justified his retention of the source code until TMG made all the installment payments on the Note. After briefing and oral arguments by the parties, the trial court denied TMG's motion for partial summary judgment, finding that there were unresolved issues of fact.

Not having the source code necessary to maintain and update the software inhibited TMG's ability to conduct business, so in late 2015 and 2016 it attempted to resolve its dispute with Mostert through negotiations. At the time these discussions took place, TMG had experienced a hard drive failure, threatening TMG's electronic infrastructure and resulting in limited operations.[2] Additionally, TMG alleged that the EquiTrax technology was in desperate need of updating, which could not be accomplished without the source code.

Given the claimed threat to TMG's business, TMG proposed an interim solution, whereby TMG would post a bond in the amount purportedly due to

---

[2] According to the Kentucky Secretary of State business records, EQUIX Biomechanics is an assumed name for The Mostert Group. The biometric analysis is performed by EQUIX. The record includes an email from EQUIX's president stating "we are out of business until we can get this up and running. And we are in this position due to the lack of source code." The hard drive failure made it impossible to access and generate computations, reports, and previously entered data — all of which TMG states are crucial to its business.

4

Mostert under the Note in exchange for Mostert immediately turning over the source code. The proposed course of action did not waive either party's claims against the other but would protect the parties' interests pending a final judgment. Although the parties disagreed on the amount of the bond, the trial court directed TMG, in a February 2016 order, to post a $250,000 bond and required Mostert to deliver the source code.[3] The trial court also scheduled a status conference three months later to allow TMG to address any issues as to the completeness of the source code and for both parties to advise the court about the progress toward resolution of their claims. TMG posted the bond and Mostert provided the source code.

Prior to the status conference, Mostert filed a motion for partial summary judgment seeking judgment on the Note and compensation for expenditures as specified in the Security Agreement.[4] Mostert argued that TMG's breach of contract claims did not constitute defenses to Mostert's claim that TMG breached the Note and Security Agreement by failing to pay the final installment. TMG countered that Mostert first breached the Contribution

---

[3] Mostert argued that he was entitled to $154,350, the final installment payment under the Note, plus $130,770 in interest on the final installment payment (accruing at a rate of 12% per annum) and $18,652 in expenses. In an affidavit, Mostert stated that he was entitled to reimbursement for expenses pursuant to the Security Agreement, in which the parties agreed that Mostert would be reimbursed for "the care, maintenance or preservation of the Collateral, and any other expenditures" that Mostert made under the Security Agreement for TMG's benefit.

[4] Mostert's motion for partial summary judgment is not in the record, but a court order entered May 24, 2016, recognizes the motion and schedules it for a hearing. In its brief, TMG quoted a portion of the motion which summarizes what Mostert sought.

Agreement by failing to deliver the source code, thereby excusing TMG from any further payment obligations under the Note.

The circuit court granted Mostert's motion for partial summary judgment based on *Bale v. Mammoth Cave Prod. Credit Ass'n*, 652 S.W.2d 851 (Ky. 1983), and *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742 (E.D. Ky. 2010), both of which held that a claim of breach of fiduciary duty cannot serve as an affirmative defense in an action to enforce a promissory note. The court held that because TMG's allegations against Mostert arose after the Note was executed, and because the trial court previously established that Mostert had a security interest in and therefore a right to possess the collateral, summary judgment was appropriate.

TMG appealed, arguing that Mostert failed to show that he was entitled to judgment as a matter of law. TMG maintained that Mostert was not entitled to the final installment payment under the Note because he breached the Contribution Agreement before the payment was due. The Court of Appeals unanimously agreed, holding that under the documents executed by the parties Mostert possessed a security interest in the software, but not the source code. The Court of Appeals reasoned that the parties would have expressly identified the "source code" as collateral in the Security Agreement if their intent was to give Mostert such an interest, noting that the distinction between software and source code had been made by the parties themselves in the Contribution Agreement. Given that Mostert had no security interest in the source code and thus no right to retain possession, the appellate court found

6

that he breached the Contribution Agreement first by failing to turn the source code over to TMG and therefore was not entitled to the final installment payment. As noted, the Court of Appeals reversed and remanded the case to the circuit court for additional proceedings.

## ANALYSIS

The primary issue in this case turns on construction of the Contribution Agreement and the Security Agreement, both executed by the parties on October 31, 2003. Mostert argues that the "software," identified as collateral in the Security Agreement includes the source code, and therefore the Security Agreement allowed him to retain possession of the source code until the Note was paid in full. TMG counters that the source code was not included as collateral under the Security Agreement, and that Mostert breached the Contribution Agreement by failing to deliver the source code immediately upon execution of that agreement and receipt of his TMG stock. Before turning to the language of the relevant agreements, we acknowledge the general principles of contract construction which guide disposition of this matter.

Judicial review of a contract begins with examination of the plain language of the instrument. "Generally, . . . in construing contracts courts endeavor to give effect to the parties' intent as expressed by the ordinary meaning of the language they employed." *North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98, 105 (Ky. 2010). "In the absence of ambiguity . . . a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence. A contract is ambiguous if a reasonable

7

person would find it susceptible to different or inconsistent interpretations."

*Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694-95 (Ky. 2016). Thus, for there to be contract ambiguities, the terms must be open to multiple interpretations, or the language itself unclear. Although parties may subsequently disagree on the meaning of terms they employed in an executed contract that does not render the contract ambiguous. As this Court has stated, "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006) (citation omitted). Finally, "interpretation of a contract, including determining whether a contract is ambiguous, is a question of law to be determined de novo on appellate review." *Ky. Shakespeare Festival*, 490 S.W.3d at 695. With these principles in mind, we turn to the documents executed by Mostert and TMG. Two contracts, the Contribution Agreement and the Security Agreement, reflect the parties' agreement with respect to entitlement to and possession of the source code at the center of their dispute.

The Contribution Agreement provides for the transfer of assets from Mostert to TMG in exchange for the agreed-upon compensation. That agreement begins with the following "Recitals":

> Whereas, [Mostert] has created certain computer software and other technology and intellectual property for the analysis of horses for racing and breeding purposes, including but not limited to the EquiTrax Technology, a technology for capture and analysis of digital streaming images of racehorses in full gallop, and [Mostert] has been using all of such property in the operation of a business under the assumed names of "The Mostert Group" and "Equimost" (the "Business");

8

Whereas, [Mostert] now desires to operate the Business through a Kentucky limited liability company and has formed [TMG] for that purpose; and

Whereas, [Mostert], who collectively owns 100% of the Business, desires to contribute to [TMG] any and all right, title and interest that it may have in any Assets (as defined herein), including without limitation all assets of [Mostert] used or intended to be used in the Business, in exchange for 200 Units in [TMG] and a Promissory Note from [TMG] in the form attached hereto as Exhibit A (the "Note"), all on the terms and subject to the conditions contained herein.

In the "Agreement" section, paragraph 2, the Contribution Agreement states:

Effective as of the date hereof, [Mostert] hereby contributes, transfers, assigns, conveys and delivers to [TMG] all of such [Mostert's] right, title and interest in and to all of the assets, properties and rights primarily used or employed, or intended by [Mostert] to be primarily used or employed, in connection with the Business (the "Assets"), consisting of those assets listed on Schedule 2A attached hereto.

The referenced Schedule 2A, entitled "Partial List of Contributed Assets," identifies in paragraph 2.1 the following assets to be transferred and delivered by Mostert to TMG : "all of [Mostert's] ownership or leasehold rights, as the case may be, in computer and telecommunication equipment, software programs, *source codes*, object codes, information systems . . . ," etc. (emphasis added). In paragraph 3 of Schedule 2A, additional assets to be transferred and delivered are identified including "[a]ny and all rights of [Mostert] to the following software and other property, and any corresponding patents, trademarks and copyrights: a) Equitrax System . . . ." Thus, pursuant to the aforequoted paragraph 2 of the Contribution Agreement, Mostert agreed to "contribute[], transfer[], assign[], convey[] and deliver[]" the identified assets to

9

TMG, effective as of October 31, 2003, the execution date of the Contribution Agreement.

The $500,000 Note issued by TMG to Mostert that same date was secured "as described in that certain Security Agreement of even date herewith by and between the Payee [Mostert] and the Maker [TMG]." The Security Agreement grants Mostert a security interest in specified collateral. It states in relevant part:

> [T]his Security Agreement is made as collateral security for the payment and performance of all the following obligations:
>
> a) $500,000.00 Term Promissory Note. [TMG's] payment of that certain Term Promissory Note payable to [Mostert] dated effective as of the date hereof in the original principal amount of $500,000.00 (the "Note") . . . .

The Security Agreement identifies the covered collateral on Schedules A and B. As relevant to the parties' dispute, Schedule B, lists "[a]ny and all rights of [Mostert] to *the following 'Software*,' and any corresponding patents, trademarks and copyrights . . . . " (emphasis added). Schedule B, a one and one-half page single-spaced document, then continues with a list of the specific "Software," which includes the EquiTrax System, Palm Profit, Compute 2000 and other named software. Finally, pertinent to our review, Paragraph 4(b)(i) of the Security Agreement provides:

> [TMG] shall have possession of the Collateral, except where expressly otherwise provided in this Security Agreement or where [Mostert] chooses to perfect its security interest by possession.

Faced with two contracts executed by the parties simultaneously, we look to the language employed in those contracts. The Contribution

10

Agreement, lists "software programs" and "source codes" (followed in the next paragraph by a reference to "software" and a listing of specific programs) as distinct properties that Mostert was obligated to contribute to TMG. By contrast, the Security Agreement only identifies certain named "software" as collateral securing TMG's performance pursuant to the Note; no mention is made of "source code." Much of Mostert's argument centers on his assertion that it is generally understood that "source code" is encompassed within the broader term "software," and therefore, any reference to "software" in the Security Agreement would necessarily include the source code. In short, he maintains that the term "software" always includes the source code, so it follows that he retained a right to possess the source code to perfect his security interest. In support of this argument, Mostert references dictionary definitions of "software," the Code of Federal Regulations and federal caselaw. Resort to secondary sources, however, is not appropriate if we can interpret the parties' intent from the language they employed. *North Fork Collieries*, 322 S.W.3d at 105; *Ky. Shakespeare Festival*, 490 S.W.3d at 694. Resolution of this case hinges on interpretation of the language used in the Contribution Agreement and the accompanying Security Agreement, making external definitions offered by Mostert immaterial.

Here, the parties specifically listed source code, object code and software as distinct items in the Contribution Agreement. Schedule 2A paragraph 2.1, as discussed above, specifically states that assets contributed by Mostert to TMG include "all of [Mostert's] ownership or leasehold rights, as the case may

11

be, in computer and telecommunications equipment, software programs, *source codes*, object codes, information systems," etc. (emphasis added). In the subsequent full paragraph, paragraph 3, additional assets to be contributed are listed and they include "any and all rights of [Mostert] to the following *software* and other property, and any corresponding patents, trademarks and copyrights: a) EquiTrax System . . ." (emphasis added). A plain reading of the documents thus reveals that the parties recognized and intended a difference between the broader term "software" and the more specific "source code." Applying this reasoning to the Security Agreement leads to the conclusion that Mostert did not have a security interest in the source code and thus was not entitled to possess it, *i.e.,* he had no right to perfect a security interest in property not covered by the Security Agreement. This conclusion is premised on the simple fact that the source code carefully delineated in the Contribution Agreement is not mentioned in the Security Agreement. To read the broader term "software" to encompass the source code would require us to ignore how the parties themselves used terms in the documents they executed.

Moreover, it is clear that the parties never intended the Security Agreement to mirror the Contribution Agreement such that Mostert retained a security interest in every single item he was obligated to contribute, transfer, assign, convey and deliver. The Security Agreement identifies the following software as collateral: EquiTrax, PalmProphet, Compute2000, Old Landscape, New Landscape, MareMatch, NetMatch, StalMatch, the Mostert Business System, and various databases. By contrast, Schedule 2A of the Contribution

Agreement lists the contributed assets as including "software programs, source codes, object codes . . ." and in a separate paragraph further down lists "the following software," which includes all the software listed above, as well as other property. Thus, several additional assets beyond the source code at the center of this litigation are listed in the Contribution Agreement but omitted from the list of collateral in the Security Agreement. This demonstrates that the parties did not intend for the Security Agreement to mirror the Contribution Agreement or, stated differently, TMG did not grant Mostert a security interest in all of the items he was obligated to transfer under the Contribution Agreement, the source code being but one example.

As the Court of Appeals stated, if the parties intended that the source code be collateral covered by the Security Agreement and that Mostert could retain possession of it the parties could have — and should have — so specified. They did not. "It is of course a fundamental tenet of this jurisdiction that the unambiguous language of a contract will be enforced as written and that the courts will not re-write the contract in contradiction of its plain meaning." *Wehr Constructors, Inc. v. Assurance Co. of America*, 384 S.W.3d 680, 685 (Ky. 2012).

Based on the plain language of both agreements, Mostert agreed to transfer the source code, and by refusing to relinquish possession he breached the Contribution Agreement. Another "fundamental principle in the law of contracts" is that "before one may obtain the benefits the contract confers upon him, he himself must perform the obligation which is imposed upon him."

13

*West Ky. Coal Co. v. Nourse*, 320 S.W.2d 311, 314 (Ky. 1959). Before TMG was obligated to pay the final installment payment on the Note in January 2009, Mostert was obligated to transfer the source code but despite repeated demands he failed to do so. "[T]he party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform. . . . [H]e who first breaches a contract must bear the liability for its nonperformance." *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956).[5] The record reflects that as early as January 2006 TMG began demanding that Mostert deliver the source code. Because the final installment payment under the Note was not due until January 2009, Mostert was the first party to breach the Contribution Agreement, and thus must bear liability.

In *Dalton*, 293 S.W.2d at 476, the court noted that when one party refused to perform under a written contract, the other party "had the right to treat this action as a breach, to abandon the contract, and to depart from further performance on his own part and finally demand damages." That is exactly the procedure TMG employed. Each party to a contract is entitled to the benefit of his bargain. Mostert's breach excused TMG's obligation to further perform under the Contribution Agreement, and therefore, Mostert was

---

[5] *See also O'Bryan v. Mengel Co.*, 6 S.W.2d 249, 251 (Ky. 1928) ("[n]o principle in the law of contracts is better settled than that the breach of an entire and indivisible contract in a material particular excuses further performance by the other party and precludes an action for damages on the unexecuted part of the contract.").

14

not entitled to summary judgment granting him judgment for the last scheduled installment payment on the Note.[6]

## CONCLUSION

For the reasons stated, partial summary judgment in favor of Mostert was improper.[7] Accordingly, we affirm the Court of Appeals' opinion reversing that partial summary judgment and remanding this case to the trial court for further proceedings consistent with this opinion.

Minton, C.J.; Keller, VanMeter, Wright, JJ., and Dunaway and Rhoads, SJ., sitting. All concur. Lambert and Nickell, JJ., not sitting.

COUNSEL FOR APPELLANT:

Frank T. Becker

COUNSEL FOR APPELLEE:

Richard A. Getty
Danielle Harlan
The Getty Law Group, PLLC

---

[6] As noted, the circuit court granted partial summary judgment in Mostert's favor based, in part, on *Bale*, 652 S.W.2d 851, which held that a claim for breach of fiduciary duty cannot serve as an affirmative defense to a claim to enforce a promissory note. Mostert cites *Bale* and *Waxman*, 726 F. Supp.2d 752, to support the proposition that an alleged breach of contract does not constitute a defense to actions on notes or security interests. However, both *Bale* and *Waxman* involved bank loans and explicitly held that a breach of fiduciary duty cannot serve as a defense to enforcement of a note. Neither case involved a breach of contract claim. No fiduciary duty is owed by either party to the other in this case but the parties did have contractual obligations as discussed. *Bale* and *Waxman* are inapplicable.

[7] We note that both parties raise issues regarding the classification of "software" under Article 9 of Kentucky's Uniform Commercial Code and whether possession is a valid method of perfection. Given our resolution of this case, we do not reach that issue.

15

# Supreme Court of Kentucky

## 2017-SC-0600-DG

PAUL MOSTERT                                                                 APPELLANT

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2016-CA-1081
FAYETTE CIRCUIT COURT NOS. 06-CI-02927 AND 08-CI-06239

V.

THE MOSTERT GROUP, LLC                                                      APPELLEE

## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the Appellant, of the Opinion of the Court, rendered March 26, 2020, is DENIED.

Minton, C.J.; Hughes, Keller, VanMeter, Wright, JJ.; Dunaway and Rhoads, S.J., sitting. All concur. Lambert and Nickell, JJ., not sitting.

ENTERED: September 24, 2020.

_____
CHIEF JUSTICE

1